**CITY OF EL PASO, Texas, Appellant,**

v.

**Holger P. VIEL, Appellee.**

**No. 08-16-00177-CV**

Court of Appeals of Texas, El Paso.

June 30, 2017

878

ATTORNEYS FOR APPELLANT: Hon. Daniel H. Hernandez, Ray, Valdez, McChristian & Jeans, P. C., 5822 Cromo Drive, Suite 400, El Paso, TX 79912, Hon. Jessica Z. Barger, Wright & Close LLP, One Riverway, Ste. 2200, Houston, TX 77056.

ATTORNEY FOR APPELLEE: Hon. Jeffrey B. Pownell, Scherr & Legate, PLLC, 109 N. Oregon, 12th Floor, El Paso, TX 79901.

Before McClure, C.J., Rodriguez, and Palafox, JJ.

## OPINION

GINA M. PALAFOX, Justice

This is an accelerated interlocutory appeal filed by Appellant City of El Paso (the City), from the trial court's denial of the City's plea to the jurisdiction. Appellee Holger Viel filed suit against the City due to injuries he sustained when an overhead rolling service door collapsed on him while he was working for an air cargo business that leased a portion of a cargo warehouse owned by the City. The City argues that it engaged in a governmental function in leasing the cargo warehouse and that it retained immunity from suit and liability for all claims Viel filed against it. For the reasons explained below, we reverse the trial court's order in part and dismiss Viel's claims for negligent use of tangible personal property, for general negligence, for negligent undertaking, and for punitive damages, all for lack of subject matter jurisdiction. We affirm the trial court's refusal to dismiss the premises defect

claim and remand that claim for further proceedings in accordance with this opinion.

## I. FACTUAL BACKGROUND

The City and Servisair USA, Inc. (Servisair) signed a lease agreement on January 22, 2013, whereby the City leased a portion of an air cargo warehouse, known as the Cargo 2 building, on property owned by the City at the El Paso International Airport (the Airport). Servisair operated a cargo business at the cargo warehouse pursuant to contracts with several airlines. Viel worked for Servisair as a "senior cargo agent." Among other duties, Viel inspected cargo shipments in transit to ensure shipments complied with federal aviation standards and were safe for air transportation.

On June 5, 2013, Viel was working at the cargo warehouse when a semi-trailer truck arrived with an outbound international air freight shipment. The truck backed up to the rolling overhead door of one of the building's loading docks. The truck's cargo door had a heavy-duty seal or lock that required the use of bolt cutters to open. After the truck parked in a loading bay, Viel opened the electronically-operated, roll-up overhead door of the building and, while standing underneath the overhead door, he attempted to cut the lock on the back of the truck. While he was using bolt cutters on the lock, the overhead door attached to the building suddenly came crashing down on Viel, hitting his lower back, knocking him forward, and causing him to strike his head against the parked truck. Viel suffered extensive injuries.

### A. Viel's Lawsuit

Nearly five months after his injury, in October of 2013, Viel sent a formal letter informing the City of his claim for injuries he sustained from the incident involving the overhead door on the City's Airport property. He later filed suit against the City and several other defendants. As against the City, Viel asserted claims of general negligence and premises liability. As against all defendants including the City, Viel sought compensatory and punitive damages.

### B. The City's Plea and Motion to Dismiss

The City filed a motion to dismiss all claims filed against it for lack of subject matter jurisdiction based on governmental immunity alleging that Viel failed to provide timely notice of his claim as required by the Texas Tort Claims Act (TTCA). By agreement, the parties delayed setting a hearing and engaged in discovery on the jurisdictional issues raised in the motion to dismiss. After a year, the City filed a combined supplemental motion to dismiss for lack of jurisdiction and motion for summary judgment with evidence attached in support of its arguments. The City argued the evidence established, as a matter of law, that the trial court lacked subject matter jurisdiction over Viel's claims because governmental immunity had not been waived and it was entitled to dismissal of all claims. Alternatively, the City further argued it was not subject to liability because no genuine issue of material fact existed as to essential elements of Viel's claims. Specifically, the City argued that Viel provided no evidence the City was in control of the overhead door at the cargo warehouse or that it had actual knowledge of the dangerous condition of the overhead door prior to the incident. Thus, the City requested dismissal with prejudice of all Viel's claims filed against it.

Viel filed a supplemental petition and a response to the City's motions. Viel asserted that the City engaged in a proprietary

function rather than a governmental function in leasing the cargo warehouse where he sustained his injury and, thus, the City was not immune from suit and could be held liable to the same extent as a private entity. Moreover, Viel argued the jurisdictional evidence raised factual issues regarding his claims brought against the City.

In reply, the City filed a response with additional evidence attached. Following a hearing, the trial court denied the City's motions. Thereafter, the City timely appealed.[1]

## II. DISCUSSION

On appeal, the City brings seven issues in arguing that the trial court erred in denying its combined motions to dismiss based on governmental immunity from suit and liability. Specifically, the City contends that: because it engaged in a governmental function, all of Viel's claims must comply with the requirements of the TTCA; that Viel did not timely comply with mandatory pre-suit notice requirements of the TTCA; that Viel failed to establish either an actionable premises defect claim or a tangible personal property claim under the TTCA; that all claims filed outside the TTCA were barred by immunity; and that exemplary damages were not permitted under the TTCA.

### A. Plea to the Jurisdiction

 As a political subdivision of the State of Texas, the City is generally protected by governmental immunity from lawsuits for money damages unless immunity has been clearly and unambiguously waived by statute. *City of El Paso v. Collins*, 483 S.W.3d 742, 749 (Tex.App.—El Paso 2016, no pet.); *see also* Tex.Gov't Code Ann. § 311.034 (West 2013) (a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language). Governmental immunity from suit defeats a trial court's subject matter jurisdiction and thus it is properly asserted in a plea to the jurisdiction. *Gay v. City of Wichita Falls*, 457 S.W.3d 499, 504 (Tex.App.—El Paso 2014, no pet.) (citing *Texas Dept. of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004)); *see also City of El Paso v. Waterblasting Techs., Inc.*, 491 S.W.3d 890, 894 (Tex.App.—El Paso 2016, no pet.) (a plea to the jurisdiction based on governmental immunity challenges a trial court's subject matter jurisdiction).

 While the City did not label its motions as a "plea to the jurisdiction," the City's combined motions function as a plea and we will treat them as such for purposes of this appeal.[2] The function of a plea to the jurisdiction is "to defeat a cause of action without regard to whether

---

1. Pursuant to Section 51.014(a)(8), the City is entitled to an interlocutory appeal of the denial of its plea to the jurisdiction and denial of its no-evidence and traditional motions for summary judgment. *See Thomas v. Long*, 207 S.W.3d 334, 339 (Tex. 2006) ("The Legislature provided for an interlocutory appeal when a trial court denies a governmental unit's challenge to subject matter jurisdiction, irrespective of the procedural vehicle used.... To be entitled to an interlocutory appeal, section 51.014(a)(8) requires the denial of a jurisdictional challenge."); *see also*

Tex.Civ.Prac. & Rem.Code Ann. § 51.014(a)(8) (West Supp. 2016).

2. Section 51.014(a)(8) of the Texas Civil Practice and Remedies Code allows an appeal from an interlocutory order that "grants or denies a plea to the jurisdiction by a governmental unit[.]" *Texas Dept. of Criminal Justice v. Simons*, 140 S.W.3d 338, 349 (Tex. 2004). The reference to "plea to the jurisdiction," however, is not to a particular procedural vehicle but to the substance of the issue raised. *Id.*

the claims asserted have merit." *Water-blasting Techs.*, 491 S.W.3d at 894 (quoting *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000)). In a plea to the jurisdiction, a defendant may challenge the sufficiency of the plaintiff's pleadings to establish jurisdiction or, alternatively, the existence of "jurisdictional facts" in support of subject matter jurisdiction. *Id.* at 895 (citing *Miranda*, 133 S.W.3d at 226); *see also Collins*, 483 S.W.3d at 748–49. The question of whether a plaintiff has alleged sufficient facts to affirmatively demonstrate a trial court's subject matter jurisdiction, as well as whether the jurisdictional facts establish a trial court's jurisdiction (or lack thereof), are both questions of law reviewed *de novo. Texas Dep't of Aging & Disability Services v. Loya*, 491 S.W.3d 920, 923 (Tex.App.—El Paso 2016, no pet.) (citing *Miranda*, 133 S.W.3d at 226); *see also Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

■ A plaintiff bears the burden of alleging sufficient facts and to come forward with jurisdictional evidence to demonstrate that the trial court has subject matter jurisdiction over its claims. *Water-blasting Techs.*, 491 S.W.3d at 895; *see also Tex. Ass'n Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). In determining whether a plaintiff has satisfied this burden, "we review the allegations in the pleadings—accepting them as true and construing them in the plaintiff's favor—and any evidence relevant to the inquiry." *Loya*, 491 S.W.3d at 923 (citing *Miranda*, 133 S.W.3d at 226-27; *Esparza v. University of Texas at El Paso*, 471 S.W.3d 903, 908 (Tex.App.—El Paso 2015); *Mayfield v. Tarrant Regional Water Dist.*, 467 S.W.3d 706, 711 (Tex.App.—El Paso 2015, no pet.)). As a non-movant, the plaintiff's burden is to produce evidence raising a genuine issue of material fact on the elements

specified in defendant's plea. Tex.R.Civ.P. 166a(i); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). If the evidence raises a fact question on jurisdiction, the plea must be denied. *Loya*, 491 S.W.3d at 923-24 (citing *Miranda*, 133 S.W.3d at 227–28; *Esparza*, 471 S.W.3d at 908; *Mayfield*, 467 S.W.3d at 711). However, if the defendant's evidence is undisputed and demonstrates a lack of jurisdiction, and if the plaintiff's responsive evidence does not raise a fact question on the jurisdictional issue, as a matter of law, the trial court must grant the plea to the jurisdiction. *Id.* at 924 (citing *Mayfield*, 467 S.W.3d at 711–12).

## B. Proprietary or Governmental Function

■ This appeal necessarily begins with the threshold question of whether the City engaged in a governmental or proprietary function in leasing the cargo warehouse where Viel allegedly sustained his injuries. Whether the City engaged in a proprietary or governmental function is a question of law reviewed *de novo. See Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 451 (Tex. 2016).

The TTCA provides that a city is not protected by immunity when performing proprietary functions as compared to governmental functions. Tex.Civ.Prac. & Rem. Code Ann. § 101.0215 (West Supp. 2016); *Williams v. City of Midland*, 932 S.W.2d 679, 682 (Tex.App.—El Paso 1996, no writ); *Turvey v. City of Houston*, 602 S.W.2d 517, 518 (Tex. 1980). The Texas Constitution authorizes the Legislature to "define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's classification assigned under prior statute or common law." *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006) (citing

TEX.CONST. art. XI, § 13); *see also Gay*, 457 S.W.3d at 504 (recognizing the 1987 Texas constitutional amendment gave the Legislature authority to define governmental and proprietary functions, including the authority to reclassify definitions already existing at common law).

Based on this grant of authority, governmental functions include airport activities, broadly described as "planning, acquisition, establishment, construction, improvement, equipping, maintenance, operation, regulation, protection, and policing of an airport or air navigation facility under this chapter, including the acquisition or elimination of an airport hazard[.]" TEX.TRANSP. CODE ANN. § 22.002(a)(2) (West 2011); *see also Irving Indep. Sch. Dist. v. Delta Airlines, Inc.*, 534 S.W.2d 365, 368 (Tex.Civ. App.—Texarkana 1976, writ ref'd n.r.e.) (under similarly-worded Texas Municipal Airports Act, the predecessor statute to the Transportation Code, cities are "authorized to construct, operate and maintain airports and have been delegated power to be exercised by them in the execution of such endeavors"); *City of Corsicana v. Wren*, 159 Tex. 202, 317 S.W.2d 516, 521 (1958) (noting that the Texas Municipal Airports Act categorized airport operations as a governmental function). Airport activities are all considered "public and *governmental functions*, exercised for a public purpose, and [are] matters of public necessity[.]" TEX.TRANSP.CODE ANN. § 22.002(a) (emphasis added). Like the Transportation Code, the TTCA also lists "airports" as a governmental function that is "enjoined on a municipality by law and ... given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public[.]" TEX.CIV.PRAC. & REM.CODE ANN. § 101.0215(a)(10).

Regarding specific airport functions, the Transportation Code provides that a mu-

nicipality's powers to operate an airport include those necessary to facilitate passenger travel as well as cargo operations. TEX.TRANSP.CODE ANN. § 22.011(b)(1)(B), (D) (West 2011) (the powers granted to a municipality include the power to construct, maintain and operate buildings at the airport for "cargo, freight, and mail handling, storage, and processing"). The construction and maintenance of a cargo building or facility is also included among the airport operating powers granted to local governments. *See* TEX.TRANSP.CODE ANN. § 22.011(b)(1)(B). In "operating an airport," a municipality may enter into a contract, lease, or other arrangement, with a third party for a term not exceeding forty years, granting the third party the "privilege of using ... a portion or facility of the airport ... or space in the airport ... for commercial purposes[.]" TEX. TRANSP.CODE ANN. § 22.021(a)(1) (West 2011); *see also Hale v. City of Bonham*, 477 S.W.3d 452, 457-58 (Tex.App.—Texarkana 2015, pet. denied) (city performing governmental function when it entered a lease for a municipal airport hangar). Municipalities are authorized to enter a lease with a third party for "conferring the privilege of supplying goods, services, or facilities at the airport...." TEX.TRANSP.CODE ANN. § 22.021(a)(2) (West 2011). In entering the lease, the municipality "may establish the terms and fix the charges, rentals, or fees for the privileges ... [t]he charges, rentals, and fees must be reasonable and uniform for the same class of privilege or service and shall be established with due regard to the property and improvements used and the expenses of operation to the local government." TEX.TRANSP.CODE ANN. § 22.021(b).

In this case, the parties are not disputing the appurtenant location of the cargo warehouse to the Airport. Two employees, Airport Director Monica Lombrana and operations supervisor Priscilla Elenez, tes-

tified that the cargo warehouse is located within the 17-mile secured and fenced area dedicated to Airport operations and considered part of the "airfield." Lombrana explained that City employees regularly patrolled the cargo warehouse area to ensure that the integrity of airport security is maintained.

At issue, Viel asserts the City's leasing of the cargo warehouse is not directly associated with Airport operations, and thus, the City did not engage in a governmental function in leasing the premises. Viel asserts that the City used its cargo warehouse to generate revenue from non-public activities thereby engaging in a function that is construed as proprietary, not governmental. Viel relies on testimony from Director Lombrana wherein she acknowledged that the City characterized the revenue received from leasing the cargo warehouse as "nonaviation" in its financial reporting.

Contrary to Viel's arguments, however, evidence supports the City's position that the leasing of the cargo warehouse pertained to Airport operations. The lease agreement narrowly restricts Servisair's use of the leased premises to "Aviation Related Operations only." The lease allows Servisair to access roadways of the Airport property and provides that Servisair employees' may enter onto the premises labeled the "restricted area of the Airport," if employees first receive security clearance from the City. The City retains the right to come onto the leased premises to address any obstructions or interference to air navigation and to eliminate any use of the premises that would constitute an "airport hazard." Director Lombrana explained that the City retains its right to enter all leased premises to fulfill its responsibility for the "integrity" and "security" of the airfield.

As for Viel's argument that the leasing of the cargo warehouse did not serve a "public" purpose, evidence established that the cargo warehouse is, in fact, open to the public for dropping off and picking up of cargo in transit. Airport security coordinator Leticia Missirian testified that there is a "public side" and an "air side" to the building. Moreover, Director Lombrana explained that the City relies on the rental revenue generated from leasing to operate the Airport. Even though it is located a half-mile from the passenger terminal, the cargo building serves the public far more than Viel acknowledges.

Thus, we determine the City was engaged in a governmental function in leasing the cargo warehouse, as statutorily permitted under Section 22.021(a)(1) of the Transportation Code, entitling the City to governmental immunity to the extent its immunity is not otherwise waived under the TTCA. Tex.Transp.Code Ann. § 22.021(a)(1); *Miranda*, 133 S.W.3d at 224-25.

Accordingly, Issue One is sustained.

## C. TTCA Pre-Suit Notice

■ In Issue Two, the City contends that governmental immunity is not waived as Viel failed to provide the City with timely pre-suit notice of his claim pursuant to the requirements of the TTCA and the City's applicable notice ordinance.

It is well recognized that failure to give proper notice to a governmental entity deprives the trial court of jurisdiction and the court must dismiss the case. Tex.Gov't Code Ann. § 311.034 (West 2013) (pre-suit notice is a jurisdictional requirement in all suits against a governmental entity); *City of Dallas v. Carbajal*, 324 S.W.3d 537, 537-38 (Tex. 2010); *City of El Paso v. Hernandez*, 342 S.W.3d 154, 158-60 (Tex.App.—El Paso 2011, no pet.). The TTCA entitles governmental entities to receive formal no-

tice of a claim against it within six months of the incident which established the basis of the claim. TEX.CIV.PRAC. & REM. CODE ANN. § 101.101(a) (West 2011). When a governmental entity is a municipality, however, the TTCA ratifies municipal provisions modifying the six-month deadline. *Id.* § .101.101(b). In this case, the City is a home rule city[3] existing under Article XI, Section 5 of the Texas Constitution. TEX. CONST. art. XI, § 5; TEX.LOCAL GOV'T CODE ANN. § 5.004 (West 2008). The El Paso Municipal Code requires written, pre-suit notice within ninety days of the incident, or within six months for good cause shown. El Paso, Tex. Municipal Code, ch. 3, § 3.28.010 (1993). Viel does not dispute that his letter to the City, sent nearly five months after the incident at issue, fell outside the ninety-day window.[4] He contends, instead, that formal notice to the City was excused as the City had actual notice of the incident within a very short period after the incident. In response to the City's plea, Viel contends a question of fact exists on whether the City acquired actual notice pursuant to Section 101.101(c) of the TTCA.[5]

 The TTCA provides that formal notice is excused "if the governmental unit has actual notice that . . . the claimant has received some injury[.]" TEX.CIV.PRAC. & REM.CODE ANN. § 101.101(c). Whether a governmental unit had actual notice of an

injury is ordinarily a question of fact, but in many cases, it may be determined as a matter of law when the evidence is insufficient to raise a fact issue. *Univ. Tex. Sw. Med. Ctr. at Dallas v. Estate of Arancibia,* 324 S.W.3d 544, 549 (Tex. 2010); *Hernandez,* 342 S.W.3d at 159. When the evidence is disputed, whether the governmental entity had actual knowledge of its fault is a fact question. *Rojas v. County of El Paso,* 408 S.W.3d 535, 540 (Tex.App.—El Paso 2013, no pet.) (citing *Texas Department of Criminal Justice v. Simons,* 140 S.W.3d 338, 348 (Tex. 2004)).

 To excuse lack of formal notice pursuant to Section 101.101(c), a claimant must establish that a governmental unit had actual notice of: "(1) a death, injury, or property damage; (2) the governmental unit's alleged fault producing or contributing to the death, injury, or property damage; and (3) the identity of the parties involved." *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex. 1995). In *Cathey,* the Court explained that the purpose of the notice requirement is "to ensure prompt reporting of claims in order to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial." *Id.*

 Nearly a decade after *Cathey,* the Texas Supreme Court clarified the second element of actual notice, stating:

---

**3.** A municipality is a home rule municipality if it operates under a municipal charter that has been adopted or amended as authorized by Article XI, Section 5, of the Texas Constitution. TEX.LOCAL GOV'T CODE ANN. § 5.004 (West 2008); *See Moreno v. City of El Paso,* 71 S.W.3d 898, 901 (Tex.App.—El Paso 2002, pet. denied) (stating that the City of El Paso is a home rule city existing under Article XI, Section 5 of the Texas Constitution).

**4.** Having determined that the City was engaged in a governmental function, we do not address Viel's argument that the notice re-

quirement does not apply when a governmental unit is engaged in a proprietary function.

**5.** At trial, Viel contended that he had good cause to waive the ninety-day requirement and he also raised a constitutional challenge against the notice requirement. On appeal, however, these arguments were not adequately briefed. *See* TEX.R.APP.P. 38.1. Nor do we address the City's argument that the letter Viel sent to the City did not comport to the TTCA's requirements as Viel is not disputing that his letter was untimely.

What we intended in *Cathey* by the second requirement for actual notice was that a governmental unit have knowledge that amounts to the same notice to which it is entitled by Section 101.101(a). *That includes subjective awareness of its fault, as ultimately alleged by the claimant, in producing or contributing to the claimed injury.* [Emphasis added].

*Simons*, 140 S.W.3d at 347.

"[A]ctual notice is a fact question when the evidence is disputed" and may be proven by circumstantial evidence. *Id.* at 348. Moreover, actual notice may be imputed to a governmental unit through an agent or representative who has the duty to investigate and report to a person of authority. *Univ. of Texas Health Sci. Ctr. at San Antonio v. Stevens*, 330 S.W.3d 335, 339 (Tex.App.—San Antonio 2010, no pet.) (citing *Texas Tech Univ. Health Sci. Ctr. v. Lucero*, 234 S.W.3d 158, 163, 168 (Tex. App.—El Paso 2007, pet. denied)).

To support his argument, Viel relies on deposition testimony and other documentation to show that shortly after the injury occurred, within the required ninety-day notice period, the City subjectively knew of both his injury and its fault in producing or contributing to it, as ultimately alleged by his pleadings. There is no dispute that several city employees were immediately aware and participated in providing aid to Viel on site at the cargo warehouse. Priscilla Elenez, an airport security officer employed by the City, arrived quickly, even before emergency responders. Seconds after she arrived, the City's fire department unit known as Rescue 32 were also on site.

Consistent with her training, Officer Elenez investigated and documented the names of witnesses and the following description of the incident:

Mr. Holger Viel was in the process of cutting off a lock for a Land Air Express truck to unload; he was bending over and cutting off the lock when the roll up Bay door dropped down on him, hitting him on his lower back. Mr. Salas, the truck driver and Fernando Pachilla [sic] another Service Air [sic] employee were standing by as the door dropped down on Mr. Viel. After the door struck him on his lower back, it knocked him forward pinning him between the truck and the bay door. Marco Parra, another Service Air [sic] employee ran around to check on Mr. Viel who was shaking but still conscious. Fernando then lifted the door with a fork lift [sic] holding the door open. They kept him sitting on the floor where he had landed until FMS arrived. Rescue 32 and ARFF 4 stabilized him on a back board and transported him to Del Sol Medical Center.

At her deposition, Elenez provided further information about her on-scene observations as well as her actions after completing her investigation. Having received information about the overhead door striking Viel, Elenez testified she placed a service tag on the door so that "they make sure that—who the responsible party fixes that door before it's used again so that there's not an issue that it is unsecure[.]" She then left the scene and reported to her supervisor to inform him of what she had learned and of her efforts to secure the overhead door for the night.

In arguing that the City had actual notice of his claim, Viel relies, in part, on a case factually similar to the circumstances presented in this case. In *Parsons*, a jail inmate filed a negligence claim arising out of a fall that occurred after leaning against a table with a steel table top. *Parsons v. Dallas County*, 197 S.W.3d 915 (Tex. App.—Dallas 2006, no pet.). The table was not anchored and slid out from under the inmate, causing the inmate to fall and sustain injuries. *Id.* at 917. Jail facility em-

ployees arranged for the injured inmate to be taken by ambulance to the hospital after his fall. *Id.* at 919. Examining the issue of actual notice, the court concluded that "[t]hose arrangements indicate the employees had immediate actual notice of the original incident, of Parsons' injuries; and the unanchored table's role in the injuries provided the County with subjective awareness of its fault." *Id.*

While the City concedes that it was aware that the overhead door fell on Viel, and that the overhead door was later repaired, it contends there is no evidence to show that anyone faulted the City for Viel's injury, or that any of its employees knew why the overhead door fell. The City points to *Simons* to support its position that a governmental unit cannot acquire actual notice as envisioned by Section 101.101(c) merely by investigating an occurrence. *Texas Department of Criminal Justice v. Simons*, 140 S.W.3d 338 (Tex. 2004). The *Simons* Court indeed stated that a routine safety investigation, standing alone, is insufficient to provide the governmental unit with actual notice of its fault in an accident. *Id.* at 347-48 ("It is not enough that a governmental unit should have investigated an incident as a prudent person would have, or that it did investigate, perhaps as part of routine safety procedures, or that it should have known from the investigation it conducted that it might have been at fault."). The City contends that Elenez merely conducted a routine safety investigation following the incident and she did not expressly reach any conclusion with respect to fault that could be imputed to the City. The City also asserts that Elenez responded to prior incidents and completed similar incident reports, therefore, her response to Viel's injury qualified as a routine safety investigation.

The City's position, however, is not supported by *Simons*. In *Simons*, the Texas Supreme Court further explained, "we did not mean that the governmental unit was required to know that the claimant had actually made an allegation of fault" since such an interpretation "would be tantamount to the notice required by section 101.101(a), only less formal, making the 'actual notice' exception in subsection (c) virtually insignificant." *Id.* at 347. To give effect to the enactment of Section 101.101(c), *Simons* rejects an interpretation that requires a claimant to prove that a governmental unit knew of an actual allegation of fault. *Id.* "If a governmental unit is not subjectively aware of its fault, it does not have the same incentive to gather information that the statute is designed to provide, even when it would not be unreasonable to believe that the governmental unit was at fault." *Id.* at 348.

Thus, contrary to the City's argument, *Simons* does not require Viel to produce evidence that he or anyone else faulted the City. *Id.* Nor is it necessary to produce a confession of fault. *See Estate of Arancibia*, 324 S.W.3d at 550 (rejecting a requirement of an unqualified confession of fault to provide actual notice of an incident). The focus is not on the purpose of the investigation (e.g. routine safety), but rather on what the investigation revealed to the governmental unit. *Ortiz-Guevara v. City of Houston*, No. 14-13-00384-CV, 2014 WL 1618371, at *3 (Tex.App.—Houston [14th Dist.] Apr. 22, 2014, no pet.) (mem. op.). If a governmental unit was able to gather information necessary "to guard against unfounded claims, settle claims, and prepare for trial," then the purpose of the notice statute has been served. *Simons*, 140 S.W.3d at 347 (citing *Cathey*, 900 S.W.2d at 341).

Elenez admitted she arrived on scene to gather information and interviewed wit-

nesses for an incident report she later provided to her supervisor, an assistant director of Airport operations. She testified that she interviewed all witnesses except for Viel who was feeling pain as he awaited an ambulance. Although Elenez testified she did not see anything broken or unusual with the overhead door, she also explained that "I'm not one to inspect it or anything like that." Her testimony establishes, however, that her attention was drawn to the overhead door as she stated, "I don't know how doors operate or what—I mean I'm sure it's—that's—you know, if it fell, something happened." Days after Elenez submitted her incident report, the City contracted a service provider to examine and test the overhead door and then to provide any needed service. The invoice dated June 18, 2013, or thirteen days after Viel's injury, stated, "Inspect and test complete door system to make sure of its proper function, inspection and lubrication of springs, cables, drums, and pulleys. Adjusted limits switches on motors and made sure keyways were not loose."

Viewing the evidence in favor of Viel, as we must, it shows that city employees learned of Viel's injury and the identity of parties involved within minutes. The City was immediately aware the overhead door played a role in the incident and exercised some authority over it by placing an out of service tag on it so that it was not opened again. The evidence here shows that within a short time, less than ninety days after the incident, the City ordered and paid for an inspection and testing of the door. Thus, on this record, we cannot conclude as a matter of law that the City was subjectively unaware of its fault in producing or contributing to the injury alleged within the requisite ninety-day period. We conclude that the evidence raises a factual issue as to whether the City had subjective awareness of its fault in contributing or producing the injury such that the City's awareness excused Viel from providing formal notice to the City. *See* TEX.CIV.PRAC. & REM. CODE ANN. § 101.101(c); *Estate of Arancibia*, 324 S.W.3d at 550; *Simons*, 140 S.W.3d at 345.

Accordingly, Issue Two is overruled.

### D. The True Nature of the Claim

In Issues Three and Four, the City contends that the trial court erred in denying its plea to the jurisdiction asserting that Viel failed to plead, and the evidence does not create, a factual dispute for a claim waiving governmental immunity. Viel's live pleadings asserted two alternative causes of action for personal injury brought under the TTCA: a negligent use of tangible personal property claim and a premises defect claim. *See* TEX.CIV.PRAC. & REM. CODE ANN. §§ 101.021(2) and 101.022(a) (West 2011). Thus, we next examine the pleading and jurisdictional evidence provided in support of these two alternative claims.

■ "[A] governmental unit is immune from suit unless the [TTCA] expressly waives immunity, which it does in three areas when the statutory requirements are met: (1) use of publicly owned automobiles; (2) injuries arising out of a condition or use of tangible personal property; and (3) premises defects." *Sampson v. Univ. of Texas at Austin*, 500 S.W.3d 380, 384 (Tex. 2016) (citing *Miranda*, 133 S.W.3d at 224-25). Relevant here, "[TTCA] waives immunity for two distinct tort causes of action: one arising from tangible personal property and one arising from a premises defect." *Id.* at 385; *see also* TEX.CIV.PRAC. & REM. CODE ANN. §§ 101.021(2) (tangible personal property) and 101.022(a) (premises defect).

■ Plaintiffs may not pursue a "premises defect claim contained in section 101.022 by re-casting the same acts as a claim relating to the negligent condition or

use of tangible property." *Sampson,* 500 S.W.3d at 385-86. Courts must consider the nature of the claim and "whether it is properly categorized as based on a premises defect or a condition or use of tangible personal property. . . ." *Id.* at 386. Determining whether a claim is based on a premises defect or one involving tangible personal property is a legal question. *Id.* at 385 (citing *Tex. Dept. of Transp. v. Ramirez,* 74 S.W.3d 864, 866 (Tex. 2002) (per curiam)) (citing *State v. Burris,* 877 S.W.2d 298, 299 (Tex. 1994) (per curiam)).

▮ In his live pleadings, Viel alleges his personal injuries occurred on premises owned and maintained by the City. Viel states his employer, Servisair, leased from the City the cargo premises where he worked. He alleges that while he worked underneath an overhead door with a motorized lift system, which was in a raised position, the overhead door "uncontrollably dropped onto his body causing severe injuries[.]"[6] He alleges he suffered injuries caused by "the inadequate and/or defective rolling door" that the City provided and failed to properly inspect or maintain. In addition to the premises defect claim, Viel alleges a tangible personal property claim. Specifically, he alleges the City was negligent in "providing the defective rolling door and other inadequate or defective tangible personal property that led to [his] injuries."

In *Sampson,* the Texas Supreme Court observed that the TTCA does not define "premises" or "tangible personal property." 500 S.W.3d at 388-89. Instead, *Sampson* stated, "[t]he definition of 'premises defect' has been developed at common law through case law distinguishing between two subspecies of negligence: causes of action for premises liability and negligent

activity." *Id.* at 388 (citing *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 527 (Tex. 1997)). "[N]egligent activity encompasses a malfeasance theory based on affirmative, *contemporaneous* conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe." *Id.* (citing *Del Lago Partners, Inc. v. Smith,* 307 S.W.3d 762, 776 (Tex. 2010)) (emphasis added). "[U]se" means "to put or bring into action or service; to employ for or apply to a given purpose." *Sampson,* 500 S.W.3d at 388 (citing *Texas Dept. of Criminal Justice v. Miller,* 51 S.W.3d 583, 588 (Tex. 2001) (citations omitted)). To state a claim for a "use" of tangible personal property under the TTCA, the injury must be *contemporaneous* with the use of the tangible personal property—"[u]sing that property must have actually caused the injury." *Id.* at 388-89. In contrast, a premises defect claim focuses on whether the defect that allegedly caused the injury is a condition of real property, even if the condition is created by an item of tangible personal property. *See id.* (extension cord positioned over concrete retaining wall created dangerous condition).

In this case, Viel did not plead any affirmative, contemporaneous conduct by a City employee that caused the overhead door to collapse onto him. Thus, Viel has not properly alleged nor established a tangible personal property claim. We find that his claim is properly characterized as one based solely on a premises defect theory of liability. *See Sampson,* 500 S.W.3d 380; *Miranda,* 133 S.W.3d at 233. Accordingly, the City retains governmental immunity for Viel's negligent use of tangible personal property claim, and thus, the trial

---

**6.** Neither party raises an issue with the "motorized lift system." Thus, we do not address or express any opinion on whether the motorized lift system and the overhead door are separate and distinct.

court erred in denying the City's plea to the jurisdiction regarding that claim.

Issue Four is sustained on this basis.

### E. Premises Defect Claim Under TTCA

Having characterized the true nature of Viel's claim as a premises defect cause of action, we next turn to further consideration of the City's third issue on appeal. The City argues that governmental immunity was not waived under the TTCA because Viel did not plead, and the evidence does not establish, an actionable premises defect claim. The City advanced two arguments in challenging Viel's premises claim. First, the City argues that Servisair exclusively possessed the premises and contracted in the lease to maintain and repair the overhead door at issue in this case. Second, the City argues the jurisdictional evidence did not raise a genuine issue of material fact as to whether the City had actual knowledge of a dangerous condition. We will address these arguments in turn.

In his live pleading, Viel pleaded the following: that Servisair leased the premises owned by the City; that governmental immunity is waived under Sections 101.021(2) and 101.022(a) of the TTCA; that the City knew, or should have known in the exercise of ordinary care, of the dangerous condition on the premises; that the City failed to warn him about the dangerous condition or make the condition reasonably safe; and that the City's breach of duty proximately caused his injuries. More particularly, Viel alleged he suffered injuries caused by "the inadequate and/or defective rolling door" that the City provided and failed to properly inspect or maintain. His pleading alleges "there was a likelihood of someone being injured as happened to [Viel]." Viel also alleged the City was the owner and operator of the property and had ultimate control over

"the inspection, maintenance, and safety of the premises."

Two provisions of the TTCA address the premises defect claim brought against a governmental unit. Section 101.021(2) waives governmental immunity for personal injuries caused by a condition on property "if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex.Civ.Prac. & Rem. Code Ann. § 101.021(2). Section 101.022(a) then prescribes the applicable duty of care owed and states, "the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises." Tex.Civ.Prac. &. Rem. Code Ann. § 101.022(a).

When construing statutory provisions, we begin with "looking to the plain and common meaning of the statute's words." *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex. 1999). We may consider all provisions of the entire act as we are not restricted to a single section in isolation. *Id.* at 866. Our primary objective is to give effect to legislative intent. *State Office of Risk Mgmt. v. Carty*, 436 S.W.3d 298, 302 (Tex. 2014) (citing *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010)). In construing the premises defect provisions of the TTCA, the Texas Supreme Court recently noted the Legislature "ostensibly incorporate[d]" common law principles to the statutory provisions of the Act. *Sampson*, 500 S.W.3d at 387; *see generally State v. Shumake*, 199 S.W.3d 279, 284-85 (Tex. 2006); *City of Tyler v. Likes*, 962 S.W.2d 489, 494 (Tex. 1997); *see also* Tex.Civ.Prac. & Rem. Code Ann. § 1.002 ("[t]he Code Construction Act (Chapter 311, Government Code) applies to the construction of each provision in [the TTCA]"); *see also* Tex.Gov't Code Ann.

§ 311.023(4) (a court may consider common law in construing a statute).

Section 101.022(a) does not provide a definition for the term "licensee." TEX.CIV. PRAC. & REM. CODE ANN. § 101.022(a). At common law, a licensee is defined as a person who, for his or her own convenience, pleasure, or benefit, enters the premises with the express or implied permission of the owner. *Almanza v. Navar*, 225 S.W.3d 14, 21 (Tex.App.—El Paso 2005, no pet.). To a licensee, a premises owner owes a duty not to injure "by willful, wanton or grossly negligent conduct, and that the owner use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner is aware and the licensee is not." *State Dept. of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992).

■■■■■ Section 101.022(a) additionally includes a conditional phrase, "unless the claimant pays for the use of the premises." The inclusion of this phrase in Section 101.022(a) necessarily implicates a duty of care owed that is different from the duty owed to a licensee when applicable. TEX. CIV.PRAC. & REM. CODE ANN. § 101.022(a). "If the claimant pays for use of the premises, the City's duty is elevated to that owed to an invitee." *City of Dallas v. Davenport*, 418 S.W.3d 844, 847 (Tex.App.—Dallas 2013, no pet.) (citing *Payne*, 838 S.W.2d at 237). At common law, an invitee is a person who enters the premises of another in answer to an express or implied invitation from the owner or occupier for their mutual benefit. *Motel 6 G.P., Inc. v. Lopez*, 929 S.W.2d 1, 3 (Tex. 1996); *Almanza*, 225 S.W.3d at 21. To an invitee, a landowner owes "a duty to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not." *Austin v. Kroger Texas, L.P.*, 465 S.W.3d 193, 203 (Tex.

2015). An invitee need only prove that the owner knew or reasonably should have known of a dangerous condition, whereas a licensee must prove that the premises owner actually knew of the dangerous condition. *Id.*; *Payne*, 838 S.W.2d at 237; *see also State v. Williams*, 940 S.W.2d 583, 584–85 (Tex. 1996) (per curiam).

When interpreting Section 101.022(a), our sister courts of appeals have focused their analysis on whether a claimant would have been allowed entry onto premises *but for* a payment made to the governmental unit that owns the property. For example, in *Patrick*, the court found that while the claimant herself did not directly pay to enter the city's zoo where she later sustained an injury, nonetheless, the evidence established that she obtained entry onto the premises through her mother's payment of a membership fee. *City of Dallas v. Patrick*, 347 S.W.3d 452, 457 (Tex. App.—Dallas 2011, no pet.) (citing TEX.CIV. PRAC. & REM.CODE ANN. § 101.022(a)). "[A] fee was paid, and—absent that payment— [claimant] could not have entered," thus, the court reasoned the claimant was owed the duty of care as an invitee. *Id.* Similarly, in *Felter*, the court determined a claimant who was a hospital visitor established she paid for use of a governmental hospital's premises under Section 101.022(a) and held invitee status as evidence showed payment was made for her husband's medical treatment. *M.D. Anderson Hosp. & Tumor Inst. v. Felter*, 837 S.W.2d 245, 247–48 (Tex.App.—Houston [1st Dist.] 1992, no writ). In *Thompson*, the court concluded a claimant paid for use of the premises under Section 101.022(a) and held invitee status through claimant's ongoing, monthly rent payment for occupancy of a housing authority apartment. *Thompson v. City of Corsicana Hous. Auth.*, 57 S.W.3d 547, 553 (Tex.App.—

Waco 2001, no pet.).[7]

In *Sullivan,* the court found that even though a wedding host had paid a rental fee for a wedding reception at a city park, a wedding guest who fell and sustained an injury had gained entry onto the premises because of the payment by the host, and thus, the injured guest held the status of an invitee. *Sullivan v. City of Fort Worth,* No. 02-10-00223-CV, 2011 WL 1902018, at *9 (Tex.App.—Fort Worth May 19, 2011, pet. denied) (mem. op.). The court explained that payment for use of the premises qualified all guests for invitee status under Section 101.022(a) because the fee was paid for entry of guests, regardless of who paid, and without such payment, no guest would have obtained entry onto the premises. *Id.; see also Texas Eng'g Extension Serv. v. Gifford,* No. 10-11-00242-CV, 2012 WL 851742, at *1 (Tex.App.—Waco Mar. 14, 2012, no pet.) (mem. op.) (claimant-employee was entitled to invitee status where employer paid for claimant-employee to participate in a training on premises at issue).

In those circumstances where a payment or fee merely relates to the premises, however, courts of appeals have determined that such payment does not constitute payment for use of the premises as contemplated under Section 101.022(a). *City of Dallas v. Davenport,* 418 S.W.3d 844, 848–49 (Tex.App.—Dallas 2013, no pet.) (claimant not invitee where payment was for

airport parking and facilities fee associated with plane ticket and not payment for use of premises under Section 101.022(a), for portion of airport open to the public where injury occurred); *Clay v. City of Ft. Worth,* 90 S.W.3d 414, 417 (Tex.App.—Austin 2002, no pet.) (revenue-sharing agreement between city and telephone company was related to, but not a fee for use of, the premises and thus telephone company employee not invitee when sustaining injuries on premises); *Garcia v. State,* 817 S.W.2d 741, 743 (Tex.App.—San Antonio 1991, writ denied) (claimant's payment of licensing fees and fuel taxes not considered payment for use of state's highway system).

Here, the City acknowledges receipt of rental payments from Servisair and states that Servisair "is not restricted to licensee status." [8] As for Viel, however, the City argues that the conditional phrase included in Section 101.022(a), "unless the claimant pays for the use of the premises," is not applicable because Viel himself did not pay for use of the cargo warehouse. The City asserts that rental payments are not relevant to the duty of care owed to Viel as the City regards his status as being distinguishable from the status of his employer.

Regarding the status of an employee in a premises liability context, the Texas Supreme Court recently confirmed that employees working at their employers' premises fit the description of an invitee and are owed the same duty of care that a

---

7. We note that in an earlier case, the Corpus Christi court indicated that even if a patient does not actually pay for a hospital bill, the Legislature did not intend the patient's physical act of payment to be determinative in deciding whether he is an invitee under the TTCA. *See Billstrom v. Mem'l Med. Ctr.,* 598 S.W.2d 642, 648 (Tex.Civ.App.—Corpus Christi 1980, no writ) (refusing to affirm a summary judgment based on the hospital's contention that the plaintiff did not pay for use of hospital because there might be a fact issue that hospital intended to treat plaintiff

as a paying patient or the patient was indigent and unable to pay).

8. The City conceded invitee status to Servisair in a post-oral-argument letter brief filed with this Court. The City cites *Brenham Hous. Auth. v. Davies,* 158 S.W.3d 53, 58 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (tenant of municipal housing authority who remitted money in consideration for occupancy of an apartment qualifies as payment for use of the premises).

landowner owes to an invitee on the premises. *Kroger Texas, L.P.*, 465 S.W.3d at 202 (citing *Hernandez v. Heldenfels*, 374 S.W.2d 196, 197 (Tex. 1963) (an employee is an invitee, rather than a licensee, while working at his employer's premises)). The *Kroger* opinion is consistent with other Texas Supreme Court cases that generally describe the duties owed by a landlord to an employee of a tenant as being the same duties a landlord owes directly to a tenant. *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex. 1993) (citing *Flynn v. Pan Am. Hotel Co.*, 143 Tex. 219, 183 S.W.2d 446, 449 (1944) (the employee of the tenant or lessee occupies no better position as against the landlord than that of his employer)).

Here, it is undisputed that the City received more than one hundred and twenty-five thousand dollars per year in rental revenue for leasing a portion of its cargo warehouse to Servisair at the time of this incident. In exchange, Servisair operated a cargo business that supported Airport functions and operations. Section 101.021(2) of the TTCA provides that a governmental unit is liable to a claimant for personal injury caused by a condition on property "if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV.PRAC. & REM.CODE ANN. § 101.021(2). If the City were a private entity, *Kroger* and *Tidwell* would prescribe the same status to Viel as it would to Servisair. *Kroger Texas, L.P.*, 465 S.W.3d at 202; *Tidwell*, 867 S.W.2d at 21.

Although the City does not cite any authority for distinguishing Viel's status from his employer, we found one case that posited a similar argument regarding the

status of an employee. In *Marshbank*, a claimant was injured when he stepped onto an uncovered hole while working as a boarding agent for a stevedore company. *Marshbank v. Austin Bridge Co.*, 669 S.W.2d 129 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.), *disapproved on other grounds by Donwerth v. Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634 (Tex. 1989). The stevedore company acted as agent for its client-shipping companies when these shipping companies' ships were in port at a dock owned, occupied, and possessed by a navigation district, a governmental unit. *Id.* at 132. The claimant sued[9] the navigation district alleging a premises defect, claiming the navigation district owed him the duty owed to an invitee due to him being an employee of a company "doing business" with the navigation district. *Id.* at 133. The court, however, refused to categorize him as an invitee because he did not pay for the use of the dock, but rather, was an employee of the stevedore company who was an agent for various shipping companies who paid the navigation district for use of the dock. *Id.*

In reviewing *Marshbank*, we found important factual distinctions from the circumstances presented in this case. The boarding agent in *Marshbank* assisted several shipping companies that paid for use of a dock. In this case, however, Viel worked only for Servisair and only Servisair paid the City for possession of the cargo warehouse and not for mere use of the premises. In conducting business on the premises, Servisair necessarily relied on its employees to perform cargo services that benefited both Servisair and the City.

---

9. In *Marshbank*, the court interpreted a previous version of the Texas Tort Claims Act which was substantially similar to Section 101.022(a). The previous statute provided: As to premises defects the unit of government shall owe to any claimant only the duty owed by private persons to a licensee on private property unless payment has been made by the claimant for the use of the premises. *See Marshbank*, 669 S.W.2d at 133 (citing TEX. REV.CIV.STAT.ANN. art. 6252-19, § 18(b) (Vernon 1970)).

*See Kroger Texas, L.P.*, 465 S.W.3d at 202. Therefore, pursuant to Section 101.022(a), Servisair paid the City for possession and use of the premises, and Viel, a cargo employee acting within the course and scope of his duties, gained entry and remained on the premises by means of those payments. *See id.*; *Patrick*, 347 S.W.3d at 457; *see also* TEX.CIV.PRAC. & REM. CODE ANN. § 101.022(a).

 Generally, a lessor has no duty to tenants or their invitees for dangerous conditions that pose an unreasonable risk of harm on the leased premises. *Johnson County Sheriff's Posse, Inc. v. Endsley*, 926 S.W.2d 284, 285 (Tex. 1996). "This general rule stems from the notion that a lessor relinquishes possession or occupancy of the premises to the lessee." *Id.* (citing Restatement (Second) of Torts § 356 cmt. a (1965)). A recognized exception, however, applies when injuries are "caused by a defect on a portion of premises that remain under the lessor's control." *Id.* (citing *Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 514–15 (Tex. 1978)); *see also* Restatement (Second) of Torts §§ 360, 361. "The relevant inquiry is whether the defendant assumed sufficient control over the part of the premises that presented the alleged danger so that the defendant had the responsibility to remedy it." *County of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002). "Control can be proven by either a contractual agreement expressly assigning the right of control or an actual exercise of control." *Cohen v. Landry's Inc.*, 442 S.W.3d 818, 824 (Tex.App.— Houston [14th Dist.] 2014, pet. denied); *see also Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). A condition poses an unreasonable risk of harm for premises-defect purposes when there is a "sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen." *Brown*, 80 S.W.3d at 556 (quoting *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 754 (Tex. 1970)).

## 1. Control of the Overhead Door

 The City argues that the overhead door that fell on Viel remained under the exclusive use and control of Servisair, as lessee of the premises. Disputing the City's position regarding the issue of control, Viel presented evidence to show that the City purchased and owned the roll-up overhead door, installed it through a third party, and retained control over it throughout the tenancy, including repairing it following the incident. Viel argues the evidence raises a genuine issue of material fact on the issue of control of the overhead door and whether the City properly maintained it under the circumstances.

In examining this issue, we first turn to the lease agreement between the City and Servisair that Viel provided in his response to the City's plea. In construing the agreement, we must ascertain and give effect to the parties' intentions as expressed in the document. *Frost Nat. Bank v. L & F Distributors, Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). As a contract, we construe the lease as a matter of law. *Id.* at 312. After the pertinent rules of contract construction are applied, if the lease can be given a definite or certain legal meaning, then it is unambiguous. *Id.* On the other hand, a lease is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.*

The relevant portions of the lease provide:

> **Section 2.02 [The City's] Right of Entry**. [The City] reserves the right to enter into and upon the Premises at all times during business hours for the purpose of inspecting the condition thereof, or to perform maintenance or repairs as

may be necessary in accordance with the provisions of this Agreement. . . .

**Section 2.03 Condition and Maintenance of Premises.** [The City] shall bear responsibility for only those repairs and maintenance to the Structural Elements of the Air Cargo Building. "Structural Elements" shall mean the roof, foundation, load bearing columns and walls, exterior walls, exterior paint, and the ramp.

. . .

**Section 3.02 Condition and Maintenance of Premises.** [Servisair] ACCEPTS THE PREMISES IN "AS IS" CONDITION. [The City] has no responsibility as to the condition of the Premises and shall not be responsible for maintenance, upkeep, or repair necessary to keep the Premises in a safe and serviceable condition. [Servisair] shall be solely responsible for repairs and maintenance of the Premises except those required for the Structural Elements referenced in Section 2.03, and shall not cause any damage or impairment to any part of the Structural Elements.

Here, there is no dispute that Sections 2.02, 2.03, and 3.02, imposed on the parties' certain obligations to maintain and repair the premises. More specifically, Sections 2.03 and 3.02, impose an obligation on the City to maintain and repair "Structural Elements," which are listed as "the roof, foundation, load bearing columns and walls, exterior walls, exterior paint, and the ramp." Whether the overhead door is included in the listed structural elements, however, is disputed and terms such as "exterior walls," are not otherwise defined.

In addition to the lease, Viel provided testimony from city employees who spoke of the maintenance history of the cargo warehouse and the function of its overhead doors in relation to airport operations. The overhead door at issue and nine others were installed by the City in July 2011 as part of a larger renovation project. Director Lombrana and the City's Assistant Director of Aviation, Jerry Bettendorf, described the installation of new overhead doors, exterior painting and re-stuccoing, as part of the City's efforts to "modernize" the cargo building to make it "more attractive and [a] more functional building."

City employees, Lombrana, Bettendorf, and Elenez, all testified that the overhead doors of the cargo building were integral to the security of the airfield. Director Bettendorf explained, "[t]hat door not closing would be a security issue, because then you have access out the back door and to the airplanes." During her regular patrol, Elenez testified she made sure overhead doors were kept closed. "We drive behind the building because that's part of our perimeter check. What we're looking at is just that the doors are secure." Viewing the evidence in the light most favorable to Viel, as we must, the overhead door at issue functioned in this circumstance as part of an exterior wall of the cargo warehouse.

Although the City argues it did not maintain an obligation to repair the overhead door, evidence provided by Viel shows the City acted contrary to this position in exercising actual control over the overhead door.[10] After the incident, Elenez testified she tagged the door with a "do not use" tag to prevent any further use of

---

**10.** The City's position of classifying the overhead door as "non-structural" regarding the lease is inconsistent with the position it took in response to the general negligence claim (non-TTCA). In the general negligence claim, the City argued that Viel "was injured by a falling garage door affixed to the warehouse structure, an obvious part of the building. . . ."

it until it was repaired to protect the security of the airport. The undisputed evidence also shows that it was the City that ordered a repair of the overhead door, not Servisair, demonstrating the City retained control over it consistent with the repair obligation of the lease provision.[11]

Servisair's manager, Jose C. Pineda, similarly testified that the City took charge to handle the overhead door repairs. When asked whether he had ever been assigned responsibility for maintaining or servicing the overhead door, Pineda responded negatively.[12] Pineda further testified that the City made it clear to him the responsibilities that were assumed by Servisair and those assumed by the City. As to the overhead door, Pineda stated that based on his review of the lease and his previous interactions with the City, the City was responsible for the overhead door during the warranty period. Once the warranty expired, he understood Servisair would then become responsible. After speaking with Leticia Missirian, the security coordinator and a person he described as "like the second in command" for the Airport, Pineda was informed that the overhead door remained under warranty when it collapsed on Viel.

Viewing the evidence in the light most favorable to Viel, the evidence indicates the City retained control over the repair and maintenance of the overhead door by terms of the lease agreement, by its actions before the incident regarding a warranty, and by its actions following the incident in how it dealt with the overhead door. Thus, we find that Viel pleaded and the evidence raised a factual dispute as to whether the City retained control of the overhead door on the premises despite having leased the cargo warehouse to Servisair.

2. Knowledge of a Dangerous Condition

■ In its second argument challenging the premises defect claim, the City argues the jurisdictional evidence did not raise a genuine issue of material fact as to whether the City had actual knowledge of a dangerous condition. The City's second argument rests on the assumption that the duty owed under Viel's premises defect claim is the duty owed to a licensee: a duty to use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner is aware and the licensee is not.[13]

■ The City argued that licensee status applied to Viel without addressing Viel's cause of action if invitee status applied instead.[14] As we earlier explained,

---

**11.** To the extent the City argues that evidence of post-accident activities is inadmissible as a subsequent remedial measure in violation of Texas Rule of Evidence 407, the City fails to recognize that evidence of subsequent remedial measures is permitted by Rule 407 to prove control when control is at issue, as it is in the present case. *See Cohen v. Landry's Inc.*, 442 S.W.3d 818, 825 (Tex.App.—Houston [14th Dist.] 2014, pet. denied); *see also* Tex.R.Evid. 407(a).

**12.** We note that Pineda submitted a "Correction Sheet" to his deposition testimony by which he inserted "financial" or "financially" responsible to his answers to questions regarding responsibility for the overhead door,

however, while Tex.R.Civ.P. 203.1(b), allows a witness to "change responses as reflected in the deposition transcript[,]" the rule requires that a correcting witness sign transcript under oath, unless an exception under Rule 203.1(c) applies. The parties do not argue or present evidence that an exception applies. The City merely points us to the corrections. We thus do not consider the "Correction Sheet."

**13.** *See Payne*, 838 S.W.2d at 237; *see also Brown*, 80 S.W.3d at 561.

**14.** In footnote 5 of its brief, the City argues that Viel "misapplies the elements necessary to meet a waiver of governmental immunity

Viel qualified as an invitee under the record presented here. As an invitee, Viel needed to plead facts sufficient to allege that the City knew or should have known of the risk of danger posed from an improperly maintained overhead door. *See Payne*, 838 S.W.2d at 237. In reviewing a trial court's order on a plea, we must construe the pleadings in the plaintiff's favor and look to the pleader's intent. *Brown*, 80 S.W.3d at 555 (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993) (citation omitted)).

Viel's premises defect claim alleges actual and constructive knowledge as the pleading states, "[Viel] suffered bodily injuries as a direct result of a dangerous condition of the premises, which [the City] knew, or in the exercise of ordinary care, should have known existed." This allegation rests on the assumption that the duty owed is that of an invitee: a duty to keep the premises reasonably safe and use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition of which the owner is or reasonably should be aware.[15]

 "Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge which can be established by facts or inferences that a dangerous condition could develop over time." *Sampson*, 500 S.W.3d at 397 (quoting *City of Corsicana v. Stewart*, 249 S.W.3d 412, 414-15 (Tex. 2008)). For actual knowledge, courts generally consider whether the premises owner had received reports of prior injuries or reports of the potential danger presented by the condi-

tion. *Univ. of Texas-Pan Am. v. Aguilar*, 251 S.W.3d 511, 513-14 (Tex. 2008) (court held that nothing in University's safety manual remotely suggested that a water hose could present an unreasonable risk of harm). Constructive knowledge, however, can be established by facts or inferences that a dangerous condition could develop over time. *Stewart*, 249 S.W.3d at 414-15.

Here, it is not disputed that the manufacturer of the overhead door included an instruction manual with its products titled, "Installation Instructions ROLLING SERVICE DOORS." In the manual's section on safety information, the instructions provide an "overview of potential hazards." The manual states, "Overhead doors are large, heavy objects that move with the help of springs under high tension and electric motors. Since moving objects, springs under tension, and electric motors can cause injuries, your safety and the safety of others depend on you reading the information in this manual." The instructions describe warnings that indicate "a potentially hazardous situation which, if not avoided, could result in death or serious injury."

The evidence is also not disputed that the manufacturer included with the overhead door a warning label or sticker containing the following excerpted warnings:

Moving door could result in death or serious injury

. . .

2. Do not stand or walk under moving door.

. . .

7. Adjustments or repairs must ONLY be made by a trained door systems tech-

---

law when he attempts to apply a common law analysis first instead of the strict [Tort Claims Act] requirements." We construe this argument as the City's dispute of the scope of duty

owed based on Viel's status at the time of the incident.

15. *See Payne*, 838 S.W.2d at 237; *see also Kroger Texas, L.P.*, 465 S.W.3d at 215.

nician using proper tools and instructions.

8. Visually inspect door and hardware monthly for worn and/or broken parts and check if door operates freely.

. . .

Place label at a readable height on door drive side guide or jamb.

The operating manual recommended that the warning label be placed on the overhead door in an area "visible to all users." There is no dispute that no warning label was present on the overhead door at the time of Viel's incident.

The record here also includes an "Inspection, Maintenance and Operational Manual." This evidence included information about the frequency and type of preventive maintenance required for the type of overhead doors selected for the cargo warehouse by the City. The manual states that "[i]t may be used as a guideline for periodic review of rolling doors to discover the most common, easily visible problems." It also states, however, that "[i]n no way does it replace regular maintenance by a trained door systems technician." Examples of maintenance information includes the following:

Door Operation:

. . .

4) Evaluate the performance of electric doors quarterly.

. . .

Gear drives:

1) Check that keystock is firmly in keyways.

. . .

3) Inspect for adequate engagement.

4) Inspect mounting bolts and nuts for tightness.

5) Lubricate gears.

6) Tighten set screws if required.

Roller chain and sprocket drives:

1) Check that keystock is firmly in keyways.

2) Tighten set screws if required.

3) Check sprocket alignment.

Several employees of the door company that installed the doors at the cargo building testified to door maintenance requirements. Arthur Garcia, the owner of the company that installed the overhead door, testified, "they're required to be serviced at least once a year, oiled up, checked." Employee Merejildo Calderon confirmed that preventive maintenance included oiling up parts, tightening of screws that hold parts in place, and checking to ensure that no parts were loose. Sales representative Jose Ramirez also testified regarding service on the doors: "[Y]ou check the tension, you check the sprockets, the chain. The doors are lubricated. We check that all the nuts and the screws are all tightened."

There is a dispute between the parties as to whether the City received the manuals and warning stickers. Viewing the evidence in the light most favorable to Viel, however, there is evidence that Arthur Garcia provided the described product documentation to the City as he explained he followed his usual practice and provided the information when he dropped off a certificate of completion he needed signed by the City to receive payment for work his company performed. When asked whether his installers placed a warning sticker on the overhead door, he testified he "dropped them off with all my paperwork," when he went to the Airport office at the completion of his work. Garcia testified, "We give them to the end user so that they put them on at their discretion." Garcia further explained that he dropped off a certificate of completion and returned a few days later to retrieve it when it was signed. City employees dispute having re-

ceived the information as described by Garcia.

There is no dispute that after the overhead door was installed, the City never inspected or otherwise provided preventive maintenance to it as recommended by the manufacturer. Viel pleaded that the City failed to maintain the overhead door, which should have been serviced and oiled at minimum once a year, and that failure increased the risk of malfunction and created a danger to others. In support of this allegation, Viel presented evidence from the repair made to the overhead door after the incident. The evidence included testimony about the observations made by technicians describing that the overhead door's key had sheared off because the keyway was empty and there was no key holding the shaft in place. In viewing the evidence as we must, an inference may be made that the City should have known that, without proper maintenance, the overhead door could fail and cause injury. Thus, we hold that a fact question remains on the issue of the City's liability for a premises defect claim for which the City's immunity was waived.

Accordingly, Issue Three is overruled.

## F. General Negligence and Negligent Undertaking Causes of Action

In Issues Five and Six, the City asserts that the trial court erred in not dismissing Viel's claims for general negligence and negligent undertaking. More specifically, the City contends that Viel did not plead, and the evidence does not establish, actionable claims since Viel's general negligence and negligent undertaking are brought outside the TTCA. Viel contends that there exist fact issues as to these claims explaining that "under Texas law, a duty of care arises when a person voluntarily undertakes a course of action and has a corresponding duty to ensure such action will not pose an increased risk of harm to others." *See, e.g., Torrington Co. v. Stutzman,* 46 S.W.3d 829, 837-39 (Tex. 2000) (elements of negligent undertaking claim are (1) defendant voluntarily undertook actions that involved the protection of others; (2) failed to exercise reasonable care ("negligence"); and (3) such negligence increased plaintiff's risk of harm).

As stated earlier in issue one, we concluded that the City was performing a governmental function regarding its leasing of an Airport cargo warehouse and Viel may only bring his claim under the limited provisions of the TTCA. *See generally City of Midland v Sullivan,* 33 S.W.3d 1, 7 (Tex.App.—El Paso 2000, pet. dism'd w.o.j.) (recognizing that a claim against a governmental entity must come within the three specific areas of liability for which immunity is waived under the Tort Claims Act, i.e., "use of publicly owned vehicles or other motor-driven equipment; a condition of real property (premises liability); and the condition or use of tangible personal property"). Viel's two causes of action would only be applicable if based on an injury that occurred while the City was performing a proprietary act for which there was no governmental immunity.

While the doctrine of "undertaking" can create a duty under certain circumstances, such as when a governmental unit is performing a governmental function and the claim against the unit is based on the duty established, the breach of that duty is limited to the causes of action for which immunity is waived under the TTCA. *See Fort Bend Cnty. Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394-95 (Tex. 1991); *City of Haltom City v. Aurell,* 380 S.W.3d 839, 854 (Tex.App.—Fort Worth 2012, no pet.) (in a premises defect case, a claim against a governmental unit for negligent undertaking must comply with the TTCA). Just as the TTCA does not create

new duties, the existence of a common law duty does not waive immunity, unless the TTCA's limited waiver applies. *See Sbrusch*, 818 S.W.2d at 394-95. As we have already determined that the City engaged in a governmental function, we necessarily conclude that any claims outside the TTCA are not viable. Thus, Issues Five and Six are sustained.

### G. Exemplary or Punitive Damages Claim

 In Issue Seven, the City asserts that the trial court erred in not dismissing Viel's claim for exemplary or punitive damages. In his last claim for relief, Viel requested an award of punitive damages against all defendants including the City. As the City points out, however, the TTCA expressly prohibits exemplary damages against a governmental entity. *See* Tex.Civ. Prac. & Rem. Code Ann. § 101.024 (West 2011); *see also City of Dallas v. Gatlin*, 329 S.W.3d 222, 226 (Tex.App.—Dallas 2010, no pet.) (recognizing that the TTCA "does not authorize exemplary damages"). As we have already concluded that Viel may only seek redress under the Tort Claims Act, we necessarily conclude that his claim for punitive damages must consequently fail. Thus, Issue Seven is sustained.

### III. <u>CONCLUSION</u>

The order of the trial court denying the City's plea to the jurisdiction is reversed regarding Viel's negligent use of tangible personal property claim, general negligence claim, negligent undertaking claim, and punitive damages claim, and thus, these claims are hereby dismissed for lack of jurisdiction. Regarding Viel's premises defect claim, we affirm the trial court's order denying the plea to the jurisdiction, and remand to the trial court for further proceedings on that claim in accordance with this opinion.