Opinion filed April 3, 2025



In The

# Eleventh Court of Appeals

_____

## No. 11-23-00204-CV

_____

## CITY OF RANGER, Appellant

## V.

## RANGER AIRFIELD MAINTENANCE FOUNDATION, Appellee

**On Appeal from the 91st District Court**
**Eastland County, Texas**
**Trial Court Cause No. CV2246534**

### O P I N I O N

This appeal originates from the trial court's denial of Appellant's plea to the jurisdiction based on governmental immunity. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (West Supp. 2024) (authorizing an interlocutory appeal from a trial court's order that denies a governmental unit's plea to the jurisdiction). In its plea, Appellant challenged the claims asserted by Appellee, which arose from

Appellant's alleged breach of contract for the conveyance of real property associated with the operation of a municipal airport.

In 2018, Appellant, the City of Ranger (the City), executed a lease agreement with Appellee, Ranger Airfield Maintenance Foundation (the Foundation), for the maintenance and operation of Ranger Airfield (the Airfield). In 2022, the City and the Foundation amended the lease agreement whereby the City agreed to convey approximately eighty-one acres of airfield property to the Foundation in exchange for the Foundation's restoration of a historical hangar and the development of the airfield property.

However, shortly after the parties executed the 2022 lease amendment, the Foundation sued the City and asserted multiple causes of action—including breach of contract, anticipatory breach of contract, and declaratory judgment under the Texas Uniform Declaratory Judgement Act (UDJA)—stemming from the City's alleged refusal to permit third parties to construct hangars on the property, and the City's alleged failure to subdivide and convey the approximately eighty-one acres of airfield property to the Foundation, as contemplated by the 2022 lease amendment. The City filed a plea to the jurisdiction, and the trial court held a hearing on the City's plea. In an amended petition that was filed after the hearing, the Foundation alternatively alleged that the Ranger city commissioners—who were then joined as defendants to the underlying suit but are not parties to this appeal—acted ultra vires when they voided the 2022 lease amendment. The trial court denied the City's plea.[1]

---

[1]We note that while the Foundation amended its pleadings to join former and current Ranger city commissioners, the City's plea only addressed the City's governmental immunity defense, not any immunity that could or would be asserted by the Ranger city commissioners. As such, the trial court's disposition of the City's plea and its order only relates to the parties to this appeal—the Foundation and the City.

On appeal, the City argues that the trial court erred when it denied its plea because: (1) the 2018 Lease and the 2022 lease amendment only pertain to the City's operation of an airport—a governmental function as a matter of law—which does not waive its immunity; (2) the parties' contract does not waive the City's immunity under Chapter 271 of the Local Government Code because "essential terms" are absent from the contract, the contract is not for goods or services, and the contract was not "properly executed"; and (3) the Foundation's ultra vires claims that it asserted against the Ranger city commissioners does not waive the City's immunity. For the reasons discussed below, we reverse and render in part, and we remand in part.

## I. *Factual and Procedural Background*

On December 4, 2018, the City and the Foundation executed a thirty-year contract (the 2018 Lease). By its terms, the Foundation would operate, maintain, and preserve Ranger's historical grass airfield as a tribute to the 1920's "Golden Age of Aviation."[2] The 2018 Lease provided that the Foundation would operate the property "for the purpose of aviation related activities, which includes normal activities related to the operation and storage of an aircraft at a public airport; aviation and civic events; and other ancillary uses." The Foundation would also retain the proceeds it derived from the operation of the airport as defined in the contract.

As an option, the 2018 Lease allowed the Foundation to improve the property by constructing new hangars and restoring the original 1928 airport hangar with the City's consent. The cost of any improvements to the property by the Foundation

---

[2]The City highlights that the 2018 Lease states that the Foundation is a "non-profit corporation." However, the City argues that the Foundation was not a "non-profit corporation" at the time it executed the contract with the City.

3

would be paid by the Foundation and any such improvements were to remain the property of the Foundation upon the expiration of the 2018 Lease. In consideration for the 2018 Lease and for its duration, the Foundation agreed to pay the City an annual one-dollar fee. The 2018 Lease also includes definitions that describe what constitutes a default or cancelation of the lease. Pursuant to the lease terms, the Foundation would be limited to the recovery of prorated costs of any improvements that it made to the Airfield because of the City's cancelation of the lease.

The City alleges that around January 31, 2022, the Foundation appeared before the Ranger city council to inquire about the City conveying the airfield property to the Foundation; the Ranger city council's deliberations concerning the Foundation's proposal—which ultimately resulted in the adoption of the 2022 lease amendment—was conducted in a closed meeting. *See* TEX. GOV'T CODE ANN. § 551.072 (West 2017). Following the Ranger city council's deliberations, the city commissioners moved to approve the Foundation's proposed amendment to the 2018 Lease (the 2022 lease amendment); the motion passed.[3] At some point, the Foundation "raised over $200,000 in funds to restore the City's existing 1928 hangar to its historical size and appearance" and it sought permits from the City to develop the eighty-one acres. According to the Foundation, the City then allegedly breached the 2022 lease amendment, through the actions of its city commissioners, when it ordered the Foundation to cease further construction and development of the Airfield.

On December 30, 2022, the Foundation filed its original petition against the City asserting causes of action for breach of contract, anticipatory breach of contract, and specific performance to require the City to allow further construction

---

[3]The City claims that the public was not notified of the City's "sale" of airfield property to the Foundation.

4

on the airfield property and to subdivide and convey the eighty-one acres of real property to the Foundation. Additionally, the Foundation sought a declaratory judgment under the UDJA that the City is obligated under the lease to convey ownership of the eighty-one acres to the Foundation, and requested attorney's fees under Chapter 38 of the Civil Practice and Remedies Code and the UDJA. On January 27, 2023, the City filed its original answer and asserted affirmative defenses to the Foundation's claims.

On March 24, 2023, the City filed its plea to the jurisdiction and argued that it is immune from suit under the UDJA and Section 271.152 of the Local Government Code. With its plea, the City attached a document titled "Eastland County Appraisal District," which includes various details about a property located in and owned by the City. Later, on August 10, 2023, the Foundation filed its first amended petition—which joined the current and former Ranger city commissioners as defendants to the suit—and alleged that the city commissioners acted ultra vires when they voided the 2022 amended lease agreement because the commissioners: (1) acted without first providing notice to the Foundation of the requirement for a 1295 Ethics Disclosure Form and the opportunity to cure; and (2) acted outside the scope of their legal or statutory authority by executing the 2022 lease amendment and/or because their actions violated the City's charter. The Foundation also alleged that the City is not immune from suit because it acted in a proprietary manner when it executed the 2022 lease amendment.

On July 27, 2023, and before the Foundation filed its first amended petition, the trial court held a hearing on the City's plea. At the hearing, the City argued that the 2022 lease amendment: (1) did not contain all the "essential terms" of a contract, such as the price to be paid; (2) did not define the time to perform; and (3) provided only for the conveyance of land, and not goods or services. The City also argued

5

that the 2022 lease amendment was not "properly executed" because the Foundation failed to include a 1295 Ethics Disclosure Form and did not comply with the mandatory statutory requirements related to the conveyance of public property to private parties under the Texas constitution and Chapters 253 and 272 of the Local Government Code, which rendered any alleged immunity waiver ineffective pursuant to Chapter 271's "properly executed" requirement. Finally, the City argued that the Foundation should not be permitted to replead the ultra vires claims asserted against the Ranger city commissioners in their official capacities, that attorney's fees were unavailable to the Foundation, and that the Foundation's governmental-proprietary function dichotomy argument did not apply or waive the City's immunity. Because of the timing of the Foundation's first amended petition, the trial court allowed the City to file a post-hearing brief to respond to the Foundation's governmental-proprietary function dichotomy argument.[4]

In response, the Foundation reiterated the arguments alleged in its pleadings and admitted that the eighty-one acres to be conveyed to the Foundation would be developed for "private residences." The Foundation also argued that the issue of notice of the sale of municipal property should not be considered because the issue was not ripe for adjudication. On August 17, 2023, the trial court signed its order denying the City's plea. This appeal followed.

## II. *Standards of Review and Applicable Law*

### A. *Plea to the Jurisdiction*

Before a court may decide a case, it is essential that the court possess subject-matter jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000). A plea to the jurisdiction is a dilatory plea and a proper method by which to

---

[4]The City's supplemental response does not appear in the record.

6

challenge a trial court's subject-matter jurisdiction. *Id.* at 554. Whether a trial court has subject-matter jurisdiction to decide a case is a question of law that we review de novo. *Harris Cnty. v. Annab*, 547 S.W.3d 609, 612 (Tex. 2018) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)); *Ector Cnty. v. Breedlove*, 168 S.W.3d 864, 865 (Tex. App.—Eastland 2004, no pet.).

The purpose of a plea to the jurisdiction is to defeat a pleaded cause of action without reaching the merits. *Blue*, 34 S.W.3d at 554. A plea to the jurisdiction can take two forms: (1) a challenge to the plaintiff's pleadings regarding the allegations of jurisdictional facts, or (2) an evidentiary challenge to the existence of jurisdictional facts. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012); *Miranda*, 133 S.W.3d at 226–27. Thus, the plea may challenge the pleadings, the existence of jurisdictional facts, or both.[5] *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018); *City of Merkel v. Copeland*, 561 S.W.3d 720, 723 (Tex. App.—Eastland 2018, pet. denied).

When the plea challenges the plaintiff's pleadings, we must determine if the pleader has alleged facts that affirmatively demonstrate the trial court's jurisdiction to hear and decide the case; in this regard, the plaintiff bears the burden to allege such facts that affirmatively demonstrate the trial court's subject-matter jurisdiction. *Tex. Dep't of Crim. Justice v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020); *Miranda*, 133 S.W.3d at 226. Therefore, we must accept as true all factual allegations in the plaintiff's pleadings, construe them liberally in the pleader's favor, and look to the pleader's intent. *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 8 (Tex. 2015); *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex.

---

[5]In its plea, the City challenged the trial court's subject-matter jurisdiction based on the state of the Foundation's pleadings regarding (1) the Foundation's allegations of jurisdictional facts and (2) the existence of jurisdictional facts in the record.

2002); *Tex. Mun. League Intergovernmental Risk Pool v. City of Abilene*, 551 S.W.3d 337, 342–43 (Tex. App.—Eastland 2018, pet. dism'd). If the allegations create a fact question regarding jurisdiction, a trial court may not grant the plea because the factfinder must resolve the fact issue. *Rangel*, 595 S.W.3d at 205; *Tex. Ass'n of Sch. Bds. Risk Mgmt. Fund v. Colorado Indep. Sch. Dist.*, 660 S.W.3d 767, 771 (Tex. App.—Eastland 2023, no pet.). But if the pleader fails to raise a fact question on the jurisdictional issue, the trial court may rule on the plea as a matter of law. *Rangel*, 595 S.W.3d at 205.

On the other hand, when the plea challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim. *Clark*, 544 S.W.3d at 770–71 (citing *Blue*, 34 S.W.3d at 555); *Weatherford Int'l, LLC v. City of Midland*, 652 S.W.3d 905, 912 (Tex. App.—Eastland 2022, pet. denied). In such cases, the standard of review mirrors that of a traditional summary judgment. *Clark*, 544 S.W.3d at 771 (citing *Miranda*, 133 S.W.3d at 225–26).

Thus, if the plaintiff's factual allegations are challenged with supporting evidence that is necessary to the consideration of the plea, the plaintiff must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject-matter jurisdiction and avoid dismissal. *Id.* (citing *Miranda*, 133 S.W.3d at 221). In determining whether a material fact issue exists, "we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor." *Id.* We cannot, however, disregard evidence that is necessary to show context; nor can we disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not. *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 811–12, 822–23, 827 (Tex. 2005)).

8

B. *Immunity Principles*

Sovereign immunity and its counterpart, governmental immunity, exist to protect the State, its agencies, and its political subdivisions from lawsuits and liability for damages. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). Governmental immunity is derived from the State's sovereign immunity. Therefore, the State's political subdivisions, which include units of local government, such as the City, are afforded the same immunity protections as the State. *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011); *Weatherford Int'l*, 652 S.W.3d at 912; *Goodson v. City of Abilene*, 295 S.W.3d 692, 694 (Tex. App.—Eastland 2009, no pet.).

Governmental immunity embraces two concepts: immunity from suit and immunity from liability. *Reata*, 197 S.W.3d at 374; *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). Governmental immunity deprives a trial court of subject-matter jurisdiction over actions in which certain governmental units have been sued unless the unit has expressly consented to suit. *Reata*, 197 S.W.3d at 374; *Miranda*, 133 S.W.3d at 224; *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003). On the other hand, immunity from liability is an affirmative defense, not a matter of subject-matter jurisdiction; however, this immunity must still be waived. *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009); *Miranda*, 133 S.W.3d at 224. Because immunity from suit defeats a trial court's subject-matter jurisdiction to hear and decide the case, it is properly raised in a plea to the jurisdiction. *Dohlen v. City of San Antonio*, 643 S.W.3d 387, 392 (Tex. 2022); *Miranda*, 133 S.W.3d at 225–26.

By challenging a governmental unit's assertion of immunity, a plaintiff may overcome a governmental unit's immunity defense only if the plaintiff demonstrates that the legislature has clearly and unambiguously waived the unit's immunity by

statute. *Rattray v. City of Brownsville*, 662 S.W.3d 860, 865 (Tex. 2023); *Dohlen*, 643 S.W.3d at 392 (citing *Tooke*, 197 S.W.3d at 330). Without such a waiver, the trial court lacks subject-matter jurisdiction to proceed, and the claims alleged against the governmental unit are barred. *Rattray*, 662 S.W.3d at 865; *Pecan Valley Mental Health Mental Retardation Region v. Doe*, 678 S.W.3d 577, 586 (Tex. App.—Eastland 2023, pet. denied). Accordingly, the trial court must dismiss the suit if the plaintiff cannot satisfy the burden of affirmatively demonstrating the trial court's jurisdiction to hear and decide the case by showing that the asserted claim falls within a statutory waiver of immunity. *Rattray*, 662 S.W.3d at 865.

C. *Statutory Interpretation*

Statutory interpretation is a question of law that we review de novo. *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404 (Tex. 2016); *Butler v. City of Big Spring*, 652 S.W.3d 149, 152 (Tex. App.—Eastland 2022, pet. denied). When construing a statute, our primary objective is to "ascertain and give effect to the Legislature's intent." *Bexar Appraisal Dist. v. Johnson*, 691 S.W.3d 844, 847 (Tex. 2024) (quoting *Odyssey 2020 Acad. Inc. v. Galveston Cent. Appraisal Dist.*, 624 S.W.3d 535, 540 (Tex. 2021)); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011); *see* GOV'T § 312.005 (West 2013).

We begin by examining the plain meaning of the statute's language. *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389–90 (Tex. 2014). We derive legislative intent from the statute as a whole and its plain language, rather than from isolated portions of it. *Odyssey*, 624 S.W.3d at 540; *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). That is, we read statutes contextually to give effect to every word, clause, and sentence because every word and phrase is presumed to have been used intentionally, with a meaning and a purpose. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018);

10

*City of Stephenville v. Belew*, 692 S.W.3d 347, 362 (Tex. App.—Eastland 2024, pet. denied). "Words and phrases shall be read in context and construed according to the rules of grammar and common usage." GOV'T § 311.011; *Cadena Commercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017); *see also Johnson*, 691 S.W.3d at 847 (Statutory terms that are not defined by the legislature "usually bear their common, ordinary meaning.").

"If [the language of] the statute is clear and unambiguous, we must read the language according to its [plain and] common meaning 'without resort to rules of construction or extrinsic aids.'" *Crosstex Energy Servs.*, 430 S.W.3d at 389 (quoting *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006)); *Butler*, 652 S.W.3d at 152. In that regard, we will presume that the legislature intended for each of the statute's words to have a purpose. *Johnson*, 691 S.W.3d at 847. Further, if a statute is unambiguous, we adopt the interpretation that is supported by the statute's plain language unless such an interpretation would yield an absurd result. *TGS-NOPEC*, 340 S.W.3d at 439 (citing *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care*, 145 S.W.3d 170, 177 (Tex. 2004)). "A statute is ambiguous if its words are susceptible to two or more reasonable interpretations and we cannot discern legislative intent from the [statutory] language alone." *Fort Worth Transp. Auth.*, 547 S.W.3d at 838.

## III. *Analysis*

On appeal, the City argues that the trial court erred when it denied the City's plea because: (1) the City is entitled to governmental immunity because it acted in its governmental capacity, and, therefore, exercised a governmental function, when it executed the 2018 Lease and 2022 lease amendment with the Foundation; (2) the City did not waive its immunity from suit under Chapter 253, Chapter 271, the Texas constitution, or any other relevant statute, based on the Foundation's asserted

11

breach-of-contract claims that are related to the 2022 lease amendment; (3) the Foundation's ultra vires claims against the Ranger city commissioners do not waive the City's governmental immunity, nor did the City waive its immunity under the UDJA; and (4) the City is immune from the Foundation's claim for attorney's fees.

We note that although the trial court denied the City's plea, the trial court's order does not recite the basis for its denial—whether the plea was denied based on the City's alleged exercise of a proprietary function or because the City waived its immunity.

A. *Governmental Immunity*

In its first issue, the City argues that it is immune from suit because it engaged in a governmental function when it contracted with the Foundation—with both the 2018 Lease and the 2022 lease amendment—for the maintenance and operation of the Airfield. Here, the Foundation does not dispute that the City is a local governmental entity, but instead argues that the City's immunity is waived because the City acted in a proprietary capacity when it executed these agreements.

Generally, municipalities may exercise their broad powers through proprietary and governmental roles. *Gates v. City of Dallas*, 704 S.W.2d 737, 738 (Tex. 1986); *Copeland*, 561 S.W.3d at 724. The governmental-proprietary function dichotomy, which stems from the common law, "recognizes that immunity protects a governmental unit from suits based on its performance of a governmental function but not a proprietary function." *Wasson Interests, Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 146 (Tex. 2018) (*Wasson II*) (citing *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 430 (Tex. 2016) (*Wasson I*)). The focus of this inquiry is "whether the municipality was engaged in a governmental or proprietary function when it entered the contract, not when [the contract was] allegedly breached." *Id.* at 149. Nevertheless, a municipality maintains the discretion as to

12

how it exercises a governmental function, and neither that discretion nor the municipality's reason(s) for engaging in an activity may convert a governmental function into a proprietary function. *Hunnicutt v. City of Webster*, 641 S.W.3d 584, 591–92 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *City of San Antonio v. Butler*, 131 S.W.3d 170, 178 (Tex. App.—San Antonio 2004, pet. denied).

To determine the boundaries of governmental immunity in the contract-claims context, we consider the relevant statutory provisions as well as the common law. *Wasson II*, 559 S.W.3d at 147–48. Additionally, we look to the definitions for governmental and proprietary functions that the legislature set forth in the Texas Tort Claims Act (TTCA) to aid in our analysis. *See* CIV. PRAC. & REM. ch. 101, *et seq.* (West 2019); *City of League City v. Jimmy Changas, Inc.*, 670 S.W.3d 494, 500 (Tex. 2023); *Wasson II*, 559 S.W.3d at 147–48 (quoting *Wasson I*, 489 S.W.3d at 439); *Copeland*, 561 S.W.3d at 724. Under the TTCA, governmental functions are defined as "those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." CIV. PRAC. & REM. § 101.0215(a). The TTCA provides a non-exhaustive list of thirty-six functions that are deemed to be governmental functions in the context of tort claims, which include the operation of airports and museums. *See* CIV. PRAC. & REM. § 101.0215(a)(10), (14); *Wasson I*, 489 S.W.3d at 439.

Proprietary functions, on the other hand, are defined in the TTCA as "those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality." CIV. PRAC. & REM. § 101.0215(b). Proprietary functions include "the operation and maintenance of a public utility," "amusements owned and operated by the municipality," and "any activity that is abnormally dangerous or ultrahazardous." *Id.* A proprietary action may be treated as a

governmental action if the proprietary action is "essential" to a governmental action. *Wasson II*, 559 S.W.3d at 153.

The City advances two contentions to support its argument that it acted in a governmental capacity when it executed these agreements. First, the City contends that it performed a governmental function when it contracted with the Foundation because the activities described in the 2018 Lease and the 2022 lease amendment—namely, the operation of an airport and museum—are expressly listed as governmental functions under the TTCA and should be construed as such as a matter of law. *See* CIV. PRAC. & REM. §101.0215(a)(10), (14). Second, the City argues that the act of contracting with the Foundation for the 2022 lease amendment was a governmental function based on the common law factors enumerated in *Wasson II*. *See Wasson II*, 559 S.W.3d at 153–54; *Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 452 (Tex. 2016) (citing CIV. PRAC. & REM. § 101.0215(b)(1)). Conversely, the Foundation contends that the City performed a proprietary function when it executed the 2022 lease amendment because (1) the TTCA classifications are "merely guidance" in determining the governmental-proprietary function dichotomy in a contract context, and (2) the application of the *Wasson II* factors establishes that the City performed a proprietary function when it contracted with the Foundation.

In considering which statutory provisions are instructive in our immunity analysis, we note that the Texas constitution specifically authorizes the legislature to define governmental and proprietary functions "for all purposes." *Jimmy Changas*, 670 S.W.3d at 499 (citing TEX. CONST. art. XI, § 13). In this case, the City relies on the inclusion of "airports" and "museums" in the TTCA's list of governmental functions to support its assertion that the conveyance of the Airfield property to the Foundation constituted a governmental function. *See* CIV. PRAC. &

REM. § 101.0215(a)(10), (14).  We agree that the TTCA plainly designates both "airports" and "museums" as governmental functions.  *Id.*  As such, because the operation of a municipal airport is a governmental function under the TTCA, this designation "aids our inquiry" in cases where breach-of-contract claims are asserted, such as the one before us.  *See Jimmy Changas*, 670 S.W.3d at 500.

In *Dallas/Fort Worth International Airport Board v. Vizant Technologies, LLC*, the Texas Supreme Court addressed whether a local governmental entity that contracted for services related to "analyzing and reducing the airport's expenses" had by its conduct engaged in a governmental function.  576 S.W.3d 362, 367 (Tex. 2019).  In ascertaining whether governmental immunity applied to shield the local government entity from suit, the court looked to other statutes—namely Section 22.002(a) of the Texas Transportation Code—to determine whether the legislature designated a particular function as governmental or proprietary.  *Vizant Techs., LLC*, 576 S.W.3d at 367 (quoting TEX. TRANSP. CODE ANN. § 22.002(a) (West 2022)); *see also City of Dallas v. Oxley Leasing N. Loop, LLC*, No. 05-21-00241-CV, 2021 WL 5275828, at *4 (Tex. App.—Dallas Nov. 12, 2021, pet. denied) (mem. op.).  The supreme court noted that the legislature "has unambiguously declared that the 'maintenance, operation, [and] regulation' of an airport and the 'exercise of any other power granted' for that purpose, whether exercised 'severally or jointly' by local governments, 'are public and governmental functions, exercised for a public purpose, and matters of public necessity.'"  *Vizant Techs., LLC*, 576 S.W.3d at 367 (quoting TRANSP. § 22.002(a)).  Thus, the court held that the local governmental entity was engaged in a governmental function when it contracted for services that were related to the analysis of airport expenses.  *Id.* at 364–67.

Here, because the City executed the contract with the Foundation for the purpose of the Foundation maintaining and operating the Airfield as an airport and constructing hangars on the property, we conclude that, in doing so, the City acted in its governmental capacity and thus performed a governmental function. Therefore, the City's governmental immunity is not waived and protects it from the Foundation's suit. *See id.*; *City of Cleburne v. RT Gen., LLC*, No. 10-20-00037-CV, 2020 WL 7394519, at *4 (Tex. App.—Waco Dec. 16, 2020, no pet.) (mem. op.) (the City was performing a governmental function when it entered into a lease agreement because the lease involved the operation, construction, and maintenance of a hangar at the City's municipal airport); *see also City of El Paso v. Viel*, 523 S.W.3d 876, 885 (Tex. App.—El Paso 2017, no pet.) (the City of El Paso engaged in a governmental function when it leased a cargo warehouse located on airport property); *Hale v. City of Bonham*, 477 S.W.3d 452, 457 (Tex. App.—Texarkana 2015, pet. denied) (a municipality's operation of an airport, including executing a lease agreement that involved the airport, is a governmental function.); *see also City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 379 (Tex. App.—Dallas 2004, no pet.).

Moreover, because the legislature expressly designated the operation of an airport as a governmental function in both the TTCA and the Transportation Code, we need not address the *Wasson II* factors in our analysis. *See RT Gen., LLC*, 2020 WL 7394519, at *3; *Elizabeth Benavides Elite Aviation, Inc. v. City of Laredo*, No. 04-19-00717-CV, 2020 WL 2044678, at *3 (Tex. App.—San Antonio Apr. 29, 2020, no pet.) (mem. op.).[6]

---

[6]Both the City and the Foundation in their briefs discuss whether the TTCA should apply to a private or public airport. However, because the plain language of Section 101.0215 of the TTCA and Section 22.002(a) of the Transportation Code do not differentiate between a private or public airport, and

Accordingly, we sustain the City's first issue.

B. *Waiver of Immunity*

However, our resolution of the City's first issue is not dispositive of this appeal because the Foundation asserts that, even if the operation of the airport is a governmental function, the City nevertheless waived its immunity for the Foundation's claim for breach of contract.

In its second issue, the City argues that its immunity is not waived under Chapter 271 of the Local Government Code for any claims related to the execution or breach of the 2022 lease amendment because the amendment (1) lacks essential terms, (2) is not a contract for goods or services, and (3) was not "properly executed." *See* TEX. LOC. GOV'T CODE ANN. § 271.151 *et seq.* (West 2016 & Supp. 2024).

Under Sections 271.151 and 271.152, a local governmental entity—which includes a municipality—may waive its immunity for a breach-of-contract claim if the contract states that the essential terms of the agreement are for providing goods or services to the local governmental entity and the contract is "properly executed" on behalf of the local governmental entity. LOC. GOV'T § 271.151, .152. Actual damages, specific performance, or injunctive relief may be granted to a claimant in a suit brought against a local governmental entity for the breach of a contract as described by Section 271.151(2)(B). *Id.* § 271.153(c).

Among other things, the Foundation contends that the City has waived the argument that it was not authorized by any statute or the constitution to execute a contract under Chapter 271. *See id.* § 271.152 ("A local governmental entity that

---

because neither party cites to any authority to support their contention on this issue, we do not address it. However, we do note that the 2018 Lease states that the "Ranger Municipal Airport will remain a Public Airport open for Public use."

is authorized by statute or the constitution to enter into a contract and [does so] subject to [Chapter 271] waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract."). We will address the parties' waiver arguments below.

1. *"Essential Terms"*

The City first argues that the Foundation's pleadings do not establish that the City waived its governmental immunity because the 2022 lease amendment lacks "essential terms" as contemplated by Section 271.151. The City further argues that the phrase "essential terms" has been interpreted to include the time of performance, the price to be paid, and the services to be rendered. *See Williams*, 353 S.W.3d at 138–39. For example, the City asserts that the 2022 lease amendment does not specify what constitutes the "restoration" of the hangar to its historical 1928 "size and appearance." According to the City, the 2022 lease amendment lacks "essential terms" because it does not state "the amount of money the Foundation must spend in order to restore the historic '1928 . . . appearance' of the original hangar[,] . . . [or the] standards related to construction, remediation, materials required, [or] interior and exterior finish" for the restoration of the hangar. Therefore, the City contends that the 2022 lease amendment lacks the terms that would allow a trial court to accurately determine what the phrase "historical size and appearance" means with a reasonable degree of certainty and definiteness. *See City of Ames v. City of Liberty*, No. 09-22-00092-CV, 2023 WL 2180967, at *8 (Tex. App.— Beaumont Feb. 23, 2023, pet. denied) (mem. op.).

In response, the Foundation argues that (1) the 2022 lease amendment includes all the essential terms of the contract when it is read in conjunction with the 2018 Lease, (2) the manner and parameters of the airport restoration are not essential to the bargain between the City and the Foundation, and (3) because the

Foundation was required to provide "restoration services" for the hangars, this is sufficient to establish the essential terms of a contract. The Foundation cites to *Clear Creek Independent School District v. Cotton Commercial USA, Inc.*, 529 S.W.3d 569, 581 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) to support its argument.

When a dispute exists concerning a contract's meaning, we must ascertain and give effect to the parties' expressed intent, and objective manifestations of intent control. *See Bluestone Nat. Res. II, LLC v. Randle,* 620 S.W.3d 380, 387 (Tex. 2021); *URI, Inc. v. Kleberg Cnty.,* 543 S.W.3d 755, 763–64 (Tex. 2018). As such, we presume that the parties intended "what the words of their contract say," and we interpret the contract's language according to its "plain, ordinary, and generally accepted meaning." *URI*, 543 S.W.3d at 764; *Rustic Nat. Res. LLC v. DE Midland III LLC*, 669 S.W.3d 494, 500 (Tex. App.—Eastland 2022, pet. denied).

An ambiguity does not arise because the parties to an agreement advance different interpretations. *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022) (citing *Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 904 (Tex. 2016)). If we determine that an agreement's language can be given a certain or definitive legal meaning or interpretation, the agreement is not ambiguous, and we will construe it as a matter of law. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019) (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)).

Although it is difficult to definitively establish which terms of an agreement are essential, "a contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016); *see Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *T.O. Stanley Boot Co. v. Bank of El Paso*,

847 S.W.2d 218, 221 (Tex. 1992). However, "if an instrument admits of two constructions, one of which would make it valid and the other invalid, the former must prevail." *Fischer*, 479 S.W.3d at 239 (quoting *Dahlberg v. Holden*, 238 S.W.2d 699, 701 (Tex. 1951)).

Material and essential terms are those that the parties "would reasonably regard as vitally important ingredients of their bargain." *Id.* at 237 (internal quotation marks omitted). Whether a contract contains all essential terms should be determined on a case-by-case basis, and the "primary purpose" of the contract governs our determination. *Barrow-Shaver*, 590 S.W.3d at 481–82. Therefore, a "court may uphold an agreement by supplying missing terms but may not create a contract where none exists and, generally, may not interpolate or eliminate essential terms." *Jennings v. Jennings*, 625 S.W.3d 854, 862 (Tex. App.—San Antonio 2021, pet. denied).

Looking to the language of the 2018 Lease, it sets forth the parties to be bound (the Foundation and the City), outlines the lease obligations for both parties, and describes the Airfield property. The 2018 Lease also states that the Airfield "will be used for the purpose of maintaining and operating the Airport and improvements as a tribute to the Golden Age of Aviation as one of the few publicly owned grass airfields still operating with history dating back to 1911." As for the construction of hangars, the 2018 Lease states that "[t]he [Foundation] may, for its purposes and approved activities, erect a building, or buildings, of a design, décor, purpose and in a place which represent the Golden Age of Aviation defined to be the 1920's to the 1930's and protects the historical aspect of the Airport."

The 2022 lease amendment also contains two provisions concerning the construction and restoration of hangars on the Airfield property. For the restoration of hangars, the contract states: "1928 Hangar. [The Foundation] shall restore [the

City's] 60'x60' 1928 hangar to its historical 1928 size and appearance." For new hangars, the contract states: "[The Foundation] shall permit not less than three (3) new, vintage-style appearance aircraft hangars." Upon the completion of these projects, according to the lease "[the City] shall convey to [the Foundation] the Airport and Airport Property as set out in Exhibit 'A.'" Attached to the 2022 lease amendment is a survey of the Airfield property that the City is to convey to the Foundation. Further, the 2022 lease amendment contains a provision that the "current runways and infield" would not be developed by the Foundation and that "no currently existing runway (longest being Runway 1/19, 3400 feet) [would] be shortened more than 25% in length or in any way permanently closed."

Based on the plain language of the 2022 lease amendment, there is a clear understanding and intent that the "primary purpose" of the lease and the lease amendment is for the Foundation to restore and operate the Airfield property—including the restoration and development of hangars on the property. Moreover, the restored hangars would be constructed to resemble a historical 1928 airport hangar. The City was to allow for the construction of at least three vintage style hangars—the description of which is sufficiently definite in the contract—on the Airfield property in exchange for conveying the eighty-one acres of Airfield property to the Foundation for their services. *See Clear Creek*, 529 S.W.3d at 581 (concluding that a contract contained all the essential terms when a party's obligation was described as "restoration services" under the contract). Therefore, we conclude that the 2022 lease amendment contains all the "essential terms" that are necessary to enforce the agreement between the City and the Foundation.

### 2. *Goods or Services*

The City next argues that the purpose of the 2022 lease amendment was not to provide "goods and services," but rather it was a contract to convey publicly

owned property to a private party.  To support its argument, the City contends that (1) the Foundation "judicially admitted" that the purpose of the contract was for the City to convey real property to the Foundation, (2) the specific performance that the Foundation sought pertains to this conveyance, and (3) any services rendered by the Foundation were neither essential terms nor the primary purpose of the contract.

As the supreme court stated in *Lubbock County Water Control and Improvement District v. Church & Akin, L.L.C.,* "a contractual relationship can include both the granting of a property interest *and* an agreement to provide goods or services."  442 S.W.3d 297, 302 (Tex. 2014) (quoting *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 925 (Tex. 2013)).  Thus, any written, authorized contract that states that the essential terms of an agreement are for providing services to a governmental entity will trigger the waiver of immunity under Chapter 271.  *Id.*  As we have said, the primary purpose of the 2022 lease amendment was for the Foundation to provide services to the City in exchange for the City's conveyance of the Airfield property to the Foundation upon the completion of the construction and restoration of the airport hangars.  Therefore, the 2022 lease amendment to provide services to the City would trigger a waiver of the City's immunity under Chapter 271 only *if* the amendment was "properly executed."  *See id.*

### 3.  *"Properly Executed"*

The City contends that the 2022 lease amendment was not "properly executed" because: (1) the amendment conveys public property to a third party—the Foundation—without the Foundation having complied with the required bidding and sales processes under Chapters 253 and 272 of the Local Government Code; (2) the Foundation did not comply with Section 2252.908 of the Government Code and failed to submit a 1295 Ethics Disclosure form at the time it

submitted the 2022 lease amendment to the City for approval; and (3) the Texas constitution prohibits the granting of public funds to private parties. *See* LOC. GOV'T §§ 253.008, 272.001; GOV'T § 2252.908(d) (West Supp. 2024); *Bowling v. City of El Paso*, 525 S.W.2d 539, 541 (Tex. App.—El Paso 1975), *writ ref'd n.r.e.*, 529 S.W.2d 509 (Tex. 1975).

In response, the Foundation argues that: (1) "the notice and bidding requirements of [Section] 272.001(a) do not apply to 'land that the political subdivision wants to have developed by contract with an independent foundation'"; (2) "the Foundation should be exempt from these requirements because it will soon complete its registration as a non-profit organization under Section 253.011"; and (3) there is sufficient consideration from the Foundation to support the City's conveyance of the Airfield property under the Texas constitution.

Because the term "properly executed" is not defined in Section 271.151, we must construe the plain meaning of this phrase. *See El Paso Educ. Initiative, Inc. v. Amex Properties, LLC*, 602 S.W.3d 521, 531 (Tex. 2020). "In this context, a contract is *properly* executed when it is executed in accord with the statutes and regulations prescribing that authority." *Id.* at 532. "'Proper' means '[a]ppropriate, suitable, right, fit, or correct; *according to the rules*.'" *Id.* (citing BLACK'S LAW DICTIONARY (11th ed. 2019)) (emphasis added). As such, for the 2022 lease amendment to be "properly executed" it must have been executed in accordance with the *rules* that govern the conveyance and sale of property by a governmental entity.

The Texas Supreme Court recently addressed how H.B. 1817 (enacted as Section 2252.908(f-1) in the Government Code) affected the requirements for filing a disclosure of interested parties, its application to contracts, and its effect on the Chapter 271 "properly executed" requirement. *See Legacy Hutto, LLC v. City of*

*Hutto*, 687 S.W.3d 67, 68–69 (Tex. 2024). Section 2252.908(f-1) states, in part, that contracts may be voidable for failure to provide the disclosure of interested parties if:

> (1) the governmental entity . . . submits to the business entity written notice of the business entity's failure to provide the required disclosure; and

> (2) the business entity fails to submit to the governmental entity . . . the required disclosure on or before the 10th business day after the date the business entity receives the written notice.

GOV'T § 2252.908(f-1). In discussing how H.B. 1817 affects a court's determination of whether a contract is "properly executed," the supreme court in *Legacy Hutto* stated:

> We presume that statutes only apply prospectively. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002). H.B. 1817, however, rebuts that presumption by expressly providing the following specific rule for any "suit challenging the validity of a contract described by Section 2252.908(b)" that was still "pending" when H.B. 1817 took effect: The "court . . . may require the governmental entity . . . to provide the written notice required under Section 2252.908(f-1) . . . if the court finds that failure to enforce that requirement would cause an inequitable or unjust result for the parties to the suit." Act of May 18, 2023, 88th Leg., R.S., H.B. 1817, § 2. The new statute further provides that a contract executed before H.B. 1817 took effect "is presumed to have been properly executed" under Section 2252.908 if, before that date, a governmental entity had not filed "an action to void or invalidate the contract" in a Texas court. *Id.* § 3.

*Legacy Hutto*, 687 S.W.3d at 69. Therefore, for the same reasons articulated by the supreme court in *Legacy Hutto*, we conclude that the 2022 lease amendment is *presumed* to have been "properly executed" pursuant to Section 2252.908 because the City did not file an action to void or invalidate the contract in a Texas court before H.B. 1817 became effective. *Id.*; *see* GOV'T § 2252.908.

24

Next, we must ascertain whether the 2022 lease amendment complies with the requirements for the notice of a sale or exchange of land under Chapters 253 and 272 of the Local Government Code.  Chapter 253 allows a municipality to convey real property or an interest in real property without complying with the notice and bidding requirements of Section 272.001 or other applicable laws.  *See* Loc. Gov't §§ 253.011, 272.001.  However, Section 272.001 does not apply to the Foundation because while the Foundation attached a certificate of formation of a nonprofit corporation to its pleadings, the Foundation concedes on appeal that it was not a non-profit corporation or foundation and did not enjoy such status at the time it executed the contract with the City.  Despite this, the Foundation states that it "should be exempt from these requirements because it will soon complete its registration as a non-profit organization under Section 253.011 of the Local Government Code."  Therefore, we look to Section 272.001 to determine if the Foundation is exempt from the notice and bidding requirements as an "independent foundation."

Section 272.001 states:

(a) [With certain exceptions], before land owned by a political subdivision of the state may be sold or exchanged for other land, notice to the general public of the offer of the land for sale or exchange must be published in a newspaper of general circulation.  The notice must include a description of the land, including its location, and the procedure by which sealed bids to purchase the land or offers to exchange the land may be submitted.  The notice must be published on two separate dates and the sale or exchange may not be made until after the 14th day after the date of the second publication.

(b) *The notice and bidding requirements of Subsection (a) do not apply to the types of land and real property interests described by this subsection and owned by a political subdivision.*  The land and those interests described by this subsection may not be conveyed, sold, or

25

exchanged for *less than the fair market value of the land* or interest unless the conveyance, sale, or exchange is with one or more abutting property owners who own the underlying fee simple. *The fair market value is determined by an appraisal obtained by the political subdivision that owns the land or interest. . . .* This subsection applies to:

. . . .

> (4) land that the political subdivision wants to have developed by contract with an *independent foundation*.

LOC. GOV'T § 272.001 (emphasis added). Consequently, for the Foundation to be exempt from Section 272.001's notice and bidding requirements, it must have pleaded facts which established that: (1) the land was not conveyed for less than fair market value; (2) the fair market value of the property was determined by an appraisal obtained by the City; and (3) the Foundation is an "independent foundation" and the City desired to develop the land to be conveyed under the contract. *Id.*

Here, the Foundation failed to plead or establish that they were exempt from the notice and bidding requirements under Section 272.001. Although the City attached an "appraisal document" to its plea, it is unclear from the language of this document as to what the "fair market value" of the Airfield property truly is. This document states the total acres for the land (81.16), and that the land's "market value" is $297,150. The document then states that the improvement value of the property is $215,830, but it is unclear what "improvement" this refers to. Further, the document includes a section for "building detail," which includes two buildings—one with an area of 11,600 square feet, and a second building with an area of 392 square feet—each with a corresponding "total" and "replacement" value. Based on this information, we cannot, and thus the trial court could not at the time it ruled on the City's plea, determine the fair market value of the Airfield

property. *But cf. Killam Ranch Properties, Ltd. v. Webb Cnty.*, 376 S.W.3d 146, 156 (Tex. App.—San Antonio 2012, pet. denied). Furthermore, this document was proffered by the City in support of its plea, not by the Foundation with its original or amended pleadings. As such, the Foundation's pleadings are devoid of any information, allegation, or recitation that would sufficiently allow the trial court (1) to conclude that the City obtained an appraisal for the fair market value of the property, or (2) to accurately determine the fair market value of the property.

Moreover, the Foundation's pleadings do not provide, or otherwise explain, the monetary value of the services that it provided to the City in exchange for the eighty-one acres of conveyed land. The 2022 lease amendment does not state whether the City conveyed the land for its "fair market value"; rather, the contract only states that it was executed by the parties "for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by both [the City] and [the Foundation]." Neither the Foundation's pleadings nor the declaration of its founder, Jared Calvert, explain the monetary value of the 1928 hangar restoration. While Calvert stated that the Foundation has "raised over $200,000 in funds to restore the City's existing 1928 hangar" and "has ordered over $100,000 in supplies," there is no evidence that these funds were tendered to the City in consideration for the eighty-one acre conveyance, or that the actual fair market value of the property was ever determined.

In this case, we cannot say that the City conveyed the Airfield property to the Foundation for fair market value—as Section 272.001(b) requires—or that there was compliance with Section 272.001's notice and bidding requirements. Therefore, because the 2022 lease amendment was not "properly executed" *according to the rules*, the City did not waive its immunity from suit under Chapter 271. *See* LOC. GOV'T §§ 271.151(2)(A), .152; *El Paso Educ. Initiative*,

27

602 S.W.3d at 531–33.[7]  Because we have concluded that the 2022 lease amendment was not "properly executed" under Chapter 271, we need not address the City's arguments that the 2022 lease amendment was not "properly executed" pursuant to the Texas constitution.[8]  *See* TEX. CONST. art. III, § 52-a; *see also* TEX. R. APP. P. 47.1.

Accordingly, we sustain the City's second issue.

C.  *UDJA and Ultra Vires Claims*

Finally, the City argues that it is immune from suit under the UDJA because the Foundation does not challenge the validity of an ordinance or statute. Additionally, the City argues that it is immune from the ultra vires claims that the Foundation has asserted against the Ranger city commissioners under the UDJA because (1) these claims cannot be used to either enforce performance against the City under a contract or impose contractual liabilities, and (2) the "Foundation's allegations do not implicate the ultra vires exception to immunity" with regard to the city commissioners.  In response, the Foundation argues that (1) the City's governmental immunity is waived for claims that seek to determine parties' rights to a contract under the UDJA, and (2) the ultra vires claims were not raised before or ruled on by the trial court.

The UDJA waives governmental immunity for (1) claims that challenge the validity of an ordinance or statute and (2) ultra vires claims against state officials

---

[7]The City argues, for the first time in its reply brief, that the 2022 lease amendment was not "properly executed" because municipal airport property is subject to the notice and bidding requirements under Section 22.024 of the Transportation Code.  *See* TRANSP. § 22.024.  Because of our disposition of this appeal, we do not address this "new" argument.  *See also* TEX. R. APP. P. 47.1.

[8]Because the City did not waive its immunity for the breach-of-contract claims asserted against it by the Foundation under Chapter 271, the Foundation is not entitled to recover attorney's fees from the City either under the contract or the UDJA.  *See* LOC. GOV'T § 271.153.

28

who allegedly act without legal or statutory authority or who fail to perform a purely ministerial act. *Mustang Special Util. Dist. v. Providence Vill.*, 392 S.W.3d 311, 316 (Tex. App.—Fort Worth 2012, no pet.) (citing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 & n.6 (Tex. 2009)). With regard to the City's first contention, it is clear that the Foundation did not challenge the validity of an ordinance or a statute under the UDJA; therefore, the first waiver exception under the UDJA is inapplicable.

"Official immunity" is another form of immunity which "protects public officials from suit[s]" that arise from the good faith performance of their discretionary duties when such duties occur within the scope of their authority. *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 422 (Tex. 2004); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). "[A] suit against a government employee in his official capacity is a suit against his government employer with one exception: an action alleging that the employee acted *ultra vires*. With that exception, an employee sued in his official capacity has the same governmental immunity, derivatively, as his government employer." *Franka v. Velasquez*, 332 S.W.3d 367, 382–83 (Tex. 2011) (footnotes omitted).

To fall within the ultra vires exception, "a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Heinrich*, 284 S.W.3d at 372; *see also Chambers–Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 348 (Tex. 2019). An official with "some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017)

(quoting *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016)).

An official's ministerial acts are those "where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015) (quoting *City of Lancaster*, 883 S.W.2d at 654); *see also Hall*, 508 S.W.3d at 238. A discretionary act, on the other hand, requires the exercise of judgment and personal deliberation. *Emmett*, 459 S.W.3d at 587. A government official acts "beyond his granted discretion" if he "exercises judgment or limited discretion 'without reference to or in conflict with the constraints of the law authorizing the official to act,' because 'a public officer has no discretion or authority to misinterpret the law.'" *Chambers–Liberty Cntys. Navigation Dist.*, 575 S.W.3d at 348 (quoting *Houston Belt & Terminal Ry. Co.*, 487 S.W.3d at 163). However, it is not an ultra vires act for a government official to make an erroneous decision while acting within his authority. *Hall*, 508 S.W.3d at 242–43.

An ultra vires claim that seeks prospective relief against a governmental official does not implicate governmental immunity because it is not a suit against a governmental entity. *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011). Therefore, suits that complain of ultra vires actions or misconduct must be brought against government officials in their official capacity and may only seek prospective injunctive relief; in such circumstances, a governmental entity itself retains its immunity from suit. *Univ. of Tex. of Permian Basin v. Banzhoff*, No. 11-17-00325-CV, 2019 WL 2307732, at *4 (Tex. App.—Eastland May 31, 2019, no pet.) (mem. op.). As such, the proper defendant to an ultra vires claim is the governmental official "whose acts or omissions allegedly trampled on the plaintiff's rights, not the [governmental entity] itself." *Sefzik*, 355 S.W.3d at 621 (citing

*Heinrich*, 284 S.W.3d at 372–73); *see also Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 76 (Tex. 2015) ("[S]uits complaining of ultra vires actions may not be brought against a governmental unit, but must be brought against the allegedly responsible government actor in his official capacity." (citing *Heinrich*, 284 S.W.3d at 373)). Furthermore, suits under the UDJA can be barred by governmental immunity. *AIM Media Texas, LLC v. City of Odessa*, 663 S.W.3d 324, 336 (Tex. App.—Eastland 2023, pet. denied).

Here, the City, as a governmental entity, is not the proper party to the Foundation's ultra vires suit against the Ranger city commissioners; thus, the City retains its immunity from that suit. *Id.*; *Sefzik*, 355 S.W.3d at 621; *Heinrich*, 284 S.W.3d at 372–73; *see Chambers-Liberty Cntys. Navigation Dist.*, 575 S.W.3d at 348; *see also AIM Media*, 663 S.W.3d at 336. Nevertheless, in this instance, because the trial court did not expressly rule on the Foundation's ultra vires claims when it denied the City's plea, and because the Ranger city commissioners are not parties to this appeal, we need not address the merits of the City's third issue.

## IV. *This Court's Ruling*

Generally, appellate courts must remand a case to the trial court to allow parties the opportunity to amend their pleadings to cure any jurisdictional deficiencies when the parties did not have the opportunity to do so in the first instance. *Clint Ind. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 558–59 (Tex. 2016); *Miranda*, 133 S.W.3d at 231. However, because the Foundation was aware of this jurisdictional challenge and had the opportunity to address these deficiencies—in fact, the Foundation amended their pleadings *after* the City filed its plea—the Foundation is not entitled to again replead and have another "bite of the apple." *Marquez*, 487 S.W.3d at 558–59; *Miranda*, 133 S.W.3d at 231.

For the reasons stated, we conclude that the trial court erred when it denied the City's plea. Accordingly, we reverse the order of the trial court, and we render judgment dismissing the Foundation's suit against the City for lack of subject-matter jurisdiction. With regard to the ultra vires claims that the Foundation has asserted against the Ranger city commissioners, we remand those claims to the trial court for further proceedings consistent with this opinion.

W. STACY TROTTER

JUSTICE

April 3, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.